**WRIST–ROCKET MANUFACTURING COMPANY, INC., Plaintiff,**

**v.**

**Charles SAUNDERS, d/b/a Saunders Archery Co., Defendant.**

**Civ. No. 72–0–120.**

United States District Court,
D. Nebraska.

May 30, 1974.

As Amended Aug. 2, 1974.

William G. Campbell, Kutak, Rock, Cohen, Campbell, Garfinkle & Woodward, Omaha, Neb., for plaintiff.

Esther O. Kegan, Kegan, Kegan & Berkman, Chicago, Ill., George R. Nimmer, Omaha, Neb., for defendant.

## MEMORANDUM OPINION

SCHATZ, District Judge.

This case was tried to the Court without a jury. Plaintiff, Wrist-Rocket Manufacturing Co., Inc., is a Nebraska corporation with its principal place of business in Columbus, Nebraska. Plaintiff is successor of the Tru-Mark Manufacturing Company which in turn succeeded the proprietorship of one Howard F. Ellenburg. Defendant, Saunders Archery Company, is a Nebraska corporation also having its principal place of business in Columbus, Nebraska. Defendant is the successor to Saunders Archery-Target Co., a co-partnership of Charles Saunders and his wife, Phyllis Saunders. This Court has jurisdiction over the parties and subject matter of these actions under 28 U.S.C. § 1338, 2201, and 15 U.S.C. § 1119, 1121.

In the winter of 1954, Howard Ellenburg (hereinafter referred to as Ellenburg) approached Charles Saunders (hereinafter referred to as Saunders) regarding the latter's interest in marketing an arm-braced slingshot device which Ellenburg had recently invented and which, at that time, he was marketing through a sporting goods distributor based in Sioux City, Iowa, under the name "Howard's Wrist Locker Slingshot." Saunders, being an experienced dealer in marketing and manufacturing archery related equipment indicated interest in the marketing of the device, and shortly after their meeting, Ellenburg terminated his relationship with the Iowa firm.

An agreement was then entered into and from the late summer of 1954 to the early fall of 1971, these individuals, and their respective successor-companies, successfully maintained the manufacture and marketing of these devices under the name "Wrist Rocket," Ellenburg manufacturing and packaging these devices in Columbus, Nebraska, and delivering them to Saunders' place of business (also in Columbus) where the latter shipped them on order to various archery dealers and jobbers throughout Nebraska and the United States. In 1965, Ellenburg registered the trademark "Wrist Rocket" in the United States Patent Office in his name doing business as Tru-Mark Manufacturing Company. The particular facts surrounding the business arrangement of these individuals will be noted in more detail throughout this opinion, but suffice it at this point to say that the relationship continued, generally unaltered, for the seventeen-year period following their initial meeting and agreement. In October, 1971, after attempts at negotiations over price and costs of the device to Saunders, the latter company informed Ellenburg that it was terminating their long-standing relationship in thirty days, which it did in November of 1971. Subsequent to this parting of the way, plaintiff revived his relationship with the Iowa sporting goods distributor and continued to manufacture the device and distribute it through that dealer under the name "Wrist Rocket." On January 25, 1972 (after the filing of the complaint herein), Ellenburg's successor company, Tru-Mark Manufacturing Company, amended its articles and changed its

name to Wrist Rocket Manufacturing Co., Inc. Saunders Archery Company, after this arrangement was dissolved by it, also began to manufacture a similar device and to market it under the same name, "Wrist Rocket."

The plaintiff, Wrist Rocket Manufacturing Co., the successor to the manufacturing concern initially started by Ellenburg (hereinafter referred to simply as Ellenburg for purposes of clarity) then filed this action for infringement of the federally registered trademark "Wrist Rocket," and for breach of fiduciary duty between its predecessor and the defendant. Defendant has counterclaimed seeking declaratory relief as to the exclusive right to the use of the trademark "Wrist Rocket;" for damages for unfair competition and deceptive trade practice under Nebraska Deceptive Trade Practices Act, Neb.R.R.S. 1943, Sections 87–301 et seq.; and for damages under 15 U.S.C. § 1120 for alleged fraudulent and false statements made by Ellenburg in his application to the United States Patent Office for the trademark registered herein.

There is no contention on the part of defendants that if the plaintiff has the exclusive right to the mark, defendant is not infringing upon it. The question relevant to the determination of the issue of infringement is whether plaintiff has such a right.

■ In order for Ellenburg to succeed in his assertion of trademark infringement, he must, of course, establish his exclusive right to use the mark here in issue. Tillamook County Creamery Ass'n v. Tillamook Cheese & Dairy Ass'n, 345 F.2d 158, 160 (9th Cir.), cert. denied, 382 U.S. 903, 86 S.Ct. 239, 15 L. Ed.2d 157 (1965); Perry v. American Hecolite Denture Corp., 78 F.2d 556, 558 (8th Cir. 1935) (Woodrough, J.).

The trademark "Wrist Rocket," Registration No. 792,882, was issued on July 20, 1965, in the name of Howard Ellenburg, d/b/a Tru-Mark Manufacturing Company. Ellenburg made application for this registration on September 14,

1964. On May 4, 1965, the mark was published pursuant to Section 12(a) of the Trademark Act of 1946, 15 U.S.C. § 1062, for purposes of allowing those opposing said registration to file an opposition. Defendant filed no such opposition and the mark was, therefore, registered in July of 1965. On November 5, 1970, Ellenburg's declaration of use, filed pursuant to Section 8 of the Act, 15 U.S.C. § 1058, was accepted and on October 8, 1971, an affidavit of incontestability was filed under Section 15 of the Act, 15 U.S.C. § 1065. In December, 1971, a written assignment of the trademark rights was made from Howard Ellenburg, d/b/a Tru-Mark Manufacturing Company, to Tru-Mark Manufacturing Corporation, the latter being the predecessor to the plaintiff now before the Court, Wrist-Rocket Manufacturing Co., Inc.

■ Plaintiff's registration of the mark "Wrist Rocket" is prima facie evidence of its exclusive right to use the registered mark in commerce on the slingshots. 15 U.S.C. §§ 1057(b), 1115(a); Phillip Morris, Inc. v. Imperial Tobacco Co., 251 F.Supp. 362, 378–379 (E.D.Va.1965), aff'd, 401 F.2d 179 (4th Cir. 1968), cert. denied, 393 U.S. 1094, 89 S.Ct. 875, 21 L.Ed.2d 784 (1969). This prima facie case does not preclude an opposing party from proving any legal or equitable defense or defect which might have been asserted in the absence of registration, 15 U.S.C. § 1115; it merely shifts the burden of doing so. Persha v. Armour & Co., 239 F.2d 628, 630 (5th Cir. 1957). Furthermore, although plaintiff does hold an affidavit of incontestability issued under 15 U.S. C. § 1065, such an affidavit is not deemed an offensive weapon to aid in plaintiff's infringement action. John Morrell & Co. v. Reliable Packing Co., 295 F.2d 314, 316 (7th Cir. 1961); Tillamook County Creamery Ass'n v. Tillamook Cheese & Dairy Ass'n, supra, 345 F.2d at 163. The registration, except for the rebuttable presumption that it creates, clearly does not create rights to a trademark if they did not exist prior

thereto. The case of Ungles-Hoggette Mfg. Co. v. Farmers' Hog & Cattle Powder Co., 232 F. 116, 119 (8th Cir. 1916), succinctly states the rule:

> If there be no valid common-law trademark by the appropriation and use of a word or symbol that indicates origin or ownership, as distinguished from describing the article manufactured or sold, the bare fact of registration cannot make it so. Registration is only prima facie evidence of ownership. If that presumption is overcome by the facts in a given case, then registration is of no avail. (Citations omitted.)

*See also*, Schwinn Bicycle Co. v. Murray Ohio Mfg. Co., 339 F.Supp. 973, 979 (M.D.Tenn.1971), aff'd, 470 F.2d 975 (6th Cir. 1972). *See generally*, 4 Callmann, Unfair Competition, Trademarks and Monopolies, Sec. 97.3(a) at 582, et seq., (3d Ed. 1970). Hence, plaintiff's infringement action depends on more than its registration and a right to the trademark must be found in the plaintiff before an infringement action can be maintained.

One obtains rights to a trademark under the common law, through a number of well-recognized avenues of procedure. To start with, a trademark is defined in the Trademark Act of 1946 as:

> \* \* \* \* \* \*
>
> . . . any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others. 15 U.S.C. § 1127.

Neither party contends that the name, "Wrist Rocket," as affixed to the slingshot device herein involved is not, or was not subject to achieving trademark status. The function of a trademark and the means by which one entity gains the exclusive right over another to affix it to certain goods is set forth in United Drug Co. v. Rectanus Co., 248 U.S. 90, 97, 100, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918):

> The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; it is not the subject of property except in connection with an existing business. (Citations omitted.)
>
> Undoubtedly, the general rule is that, as between conflicting claimants to the right to use the same mark, priority of appropriation determines the question. \* \* \* (T)he reason is that purchasers have come to understand the mark as indicating the origin of the wares, so that its use by a second producer amounts to an attempt to sell his goods as those of his competitor. (Citations omitted.)

*See also* Digicom, Inc. v. Digicon, Inc., 328 F.Supp. 631, 634 (S.D.Tex.1971). Stated in yet another way:

> Where a party has been in the habit of labeling his goods with a distinctive mark, so that purchasers recognize goods thus marked as being of his production, others are debarred from applying the same mark to goods of the same description, because to do so would in effect represent their goods to be of his production and would tend to deprive him of the profit he might make through the sale of the goods which the purchaser intended to buy. Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 412, 36 S.Ct. 357, 360, 60 L.Ed. 713 (1916).

Thus, the policy of trademark protection revolves around protection of the owner's good will developed by him in his efforts to sell the goods to the public. The public identification of the mark in relation to the goods is of clear consequence to the owner of the mark. Trademark law is, therefore, not only designed to protect the public against false and deceptively marked goods, but also to secure to the owner the good will

of his business. Esso, Inc. v. Standard Oil Company, 98 F.2d 1, 5 (8th Cir. 1938). Priority of appropriation or priority of adoption *and* use are the most commonly accepted guideposts in determining the ownership of a particular trademark.[1] 3 Callmann, *supra*, Section 76.1 at 272–278 (3d Ed. 1969). The "use" of a trademark on goods is the placing of the mark "on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto . . . ." 15 U.S.C. § 1127. Although registration under the Trademark Act requires "use" generally in interstate commerce a mark is clearly obtainable under the common law principles notwithstanding its intrastate nature.

■ In regard to the determination of whether one person has ownership over the use of a mark in bar to another, the priority of use stands as a guiding light. This priority, however, is a relative concept rather than one necessitating proof of absolute priority such as that required of an inventor seeking a patent. 3 Callmann, *supra*, Section 76.-2(c) at 284–285; Jacoway v. Young, 228 F. 630, 633 (8th Cir. 1915). In other words, it cannot be looked upon totally as what Callmann refers to as a "calendar concept."

> Most cases involving colliding trademarks cannot be resolved on the basis of priority alone. . . . The greater the effort devoted to creating an intangible value, the more safely can its originator rely upon the element of priority. If the right is based upon an inventive idea or on artistic or literary creation, priority would be determined by an independent criterion. Instances are patent and copyright, which are subject to the priority concept in the sense of a calendar date. In the law of trade-

> marks, however, where popularization and advertising values are far more significant than the idea on which the intangible value is bottomed, priority is similarly determinative, but not in its calendar sense; it is a principle based upon the equities involved. Although adherence to the principle of priority has the advantage of temporal consistency, if it is applied as a dispositive test to resolve the trademark conflict, it might often result in injustice. (Footnotes omitted.)

3 Callmann, *supra*, Section 76.3(a) at 301–302. *See also* Chandon Champagne Corp. v. San Marine Wine Corp., 335 F. 2d 531, 534 (2d Cir. 1964) (Friendly, J.).

## RIGHTS IN THE TRADEMARK "WRIST ROCKET"

Plaintiff agrees that it cannot rest entirely on its registration as proof of its ownership of the mark. It contends, however, that pursuant to the terms of the agreement which the parties entered into in July of 1954, the Saunders company was merely plaintiff's exclusive distributor for marketing of the device and, therefore, under a line of authority represented by such cases as United States Ozone Co. v. United States Ozone Co. of America, 62 F.2d 881, 886 (7th Cir. 1932) and Shaver v. Heller and Merz Co., 108 F. 821, 824 (8th Cir. 1901), the defendant did not acquire any rights to the trademark during the term of the agreement.

Defendant disputes the characterization of the relationship that existed as being one of exclusive distributor and contends rather that it was merely one of buyer and seller and that Saunders invented the name and controlled the use of the trademark on the slingshot which was manufactured according to its specifications and recommendations by Ellenburg. Defendant contends that it is the

---

1. The equitable doctrines of laches, estoppel and abandonment also obtain in the consideration of which of competing parties have rights to a trademark. *See, e.g.,* Hanover Star Milling Co. v. Metcalf, *supra,* 240 U.S. at 418–419; 15 U.S.C. § 1127 (defining "abandonment"). *See also* 3 Callmann, *supra,* Sections 79.1 to 79.4 at 514, et seq. However, from the argument and briefs of counsel herein, neither party attempts to assert those doctrines.

company with which the public associates the name "Wrist Rocket" and further contends that it controlled the quality and price of the slingshots throughout the years, and was responsible for any liability caused because of the device and for replacement of defective parts thereof. In addition to the defendant's obvious concern with plaintiff's contention that the business relationship was one of exclusive distributor, the defendant contends that it was the first or prior user because it was the first to affix a tag on the device and the one who initiated the design of the first point of sale box utilized for sale of the device.

█ Plaintiff's alleged right to this trademark "Wrist Rocket," as stated above, is based on his contention that an exclusive distributorship relationship existed and, therefore, the actions of the defendant Saunders in using the name "Wrist Rocket" cannot be used as the basis for arguing that the trademark was adopted by defendant because his actions were all taken to promote the slingshot, as required by the exclusive distributorship relationship. (Plaintiff's post-trial brief, page 2.) Thus the plaintiff seems to contend that upon a finding of an exclusive distributorship relationship, trademark law requires that there be a finding that the plaintiff has the exclusive right to the trademark. The cases it cites for such authority are: Shaver v. Heller & Merz Co., supra, 108 F. 821; Omag Optik Und Mechanik A. G. v. Weinstein, 85 F.Supp. 631 (S.D.N.Y.1949); Stratton and Terstegge Co. v. Stiglitz Furnace Co., 258 Ky. 678, 81 S.W.2d 1 (1935); United States Ozone Co. v. United States Ozone Co., supra, 62 F.2d 881. In all the aforementioned cases the determining rule of trademark law was that when the owner of a trademark enters into a relationship with a distributor or other agents so the latter may use the trademark on goods, the person to whom such license to use is granted (oftentimes an exclusive distributor or sales agent) acquires no right to exclusive use of the mark in the absence of inequitable conduct. In those cases, the Court first found the manufacturing party to be the original owner of the mark. At that point the courts looked at the relationship between the parties as per the agreement involved, and determined that since it was only a grant of license to use the mark, the distributor's or agent's rights to the mark terminated when the agreement terminated. The relationships involved were usually that of exclusive distributorship, but the courts' opinion did not specifically turn on that finding. It turned on the principle that an owner does not lose rights to trademarks because he allows someone else to use them, unless he is deemed to have abandoned them or is estopped by laches from asserting a right to them. The cases offer little help in determining who the *initial* owner of a mark is except for enunciating the general rules which are previously set forth.

Atlas Beverage Co. v. Minneapolis Brewing Co., 113 F.2d 672 (8th Cir. 1940) was a case very similar to the present one insofar as the issue presented is concerned. It involved a beer manufacturer and a distributor who had entered into an exclusive agreement whereby the latter would distribute "Grain Belt" beer for the former. That brand did not sell, and while the agreement was in effect, the name "White Seal" was invented and applied to the beer. The Court stated the issue before it as one of determining the ownership to the rights of the trademark "White Seal" which it stated depended on the facts of the arrangement between the brewing company and the distributor when the mark was adopted for use on the label to be put upon the bottles used to contain the beer. There, as here, there was no agreement as to the use of the mark. Here, as in *Atlas*, the Court is not faced with the question of whether an admitted prior user has abandoned trademark rights to his distributor, but rather with the question as to who the initial owner was. This distinction was recognized in the case of Distillers Brands v. American Distilling Co., 26 F.Supp. 988, 989

(S.D.N.Y.1938). In that case the distributor of whiskey had the bottler of the whiskey prepare a label to put on the bottles before delivering them to the distributor. The label said "bottled for" the distributing company and made no mention of the bottler. The court found that since the bottler was anonymous and the public associated the mark with the distributor, the latter was the owner of the mark and distinguished the *Shaver* case, herein cited by the plaintiff on the ground that in those cases the trademark had been used by the manufacturer *before* the business relationship developed. *See also* E. F. Prichard Co. v. Consumers Brewing Co., 136 F.2d 512, 519 (6th Cir.), cert. denied, 321 U.S. 763, 64 S.Ct. 486, 88 L.Ed. 1060 (1943). That distinguishing factor is equally applicable here.

The resolution of who has the right to the mark in this case does not turn on whether the defendant was an exclusive distributor for plaintiff.[2] The law recognizes that a distributor of products may acquire trademark rights over those of the manufacturer if the facts support a finding that they are " '. . . manufactured for him, that he controls their production, or that they pass through his hands in the course of trade and that he gives to them the benefit of his reputation or of his name and business style.' " Electronic Communiations, Inc. v. Electronic Components for Industry Co., 443 F.2d 487, 492 (8th Cir.), cert. denied, 404 U.S. 833, 92 S.Ct. 80, 30 L.Ed.2d 63 (1971). *See also* Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526 (1888).

Since the agreement of July, 1954, contained nothing about the use of the trademark, and since it was not even in existence at that time, the general prin-

ciples applicable to the finding of rights to a trademark must be considered in light of the relevant facts.

Ellenburg contacted Saunders in January or February of 1954 for purposes of a market for the slingshot which plaintiff was then manufacturing in his basement for sale to a sporting goods dealer in Iowa. Saunders showed some interest at that time but indicated that the appearance of the slingshot would have to be changed, as well as its name, before the item would be handled by him. Saunders also encouraged plaintiff to terminate the arrangement with the Iowa concern which plaintiff proceeded to do for a nominal sum. Saunders then sold a few of the items to retailers within the community under the name "Howard's Wrist-Locker Slingshot," which was the name plaintiff had been selling them under prior to contacting Saunders. At this time, Ellenburg was a "handyman" who had no experience in the marketing of manufactured goods. Saunders had been operating in Columbus, Nebraska, since 1941 as a manufacturer and distributor of archery target mats, faces and stands. Saunders invented the name "Wrist Rocket" sometime in the summer of 1954 to replace that of "Howard's Wrist-Locker Slingshot."

The evidence discloses that Ellenburg sold no slingshots under the name "Wrist Rocket" after the name was developed by Saunders and before the first group was delivered to Saunders Archery Target Company in the late summer of 1954. Ellenburg had applied "Howard's Wrist-Locker" labels to the device within the local community prior to that time and did not put "Wrist Rocket" labels on the device until 1955 after the parties started doing business. Prior to that, in the fall of 1954, Saunders af-

---

2. Plaintiff might have contended that since Saunders was its agent, all the fruits of that agency accrued to plaintiff's benefit. However, the facts would not have supported this conclusion. The relationship of the parties will be discussed in greater detail when considering the fiduciary duty issues, *infra*. Suffice it to say at this point that certainly no pure agency relationship existed and whatever the terms involved, no mention was made regarding the use of the trademark in question in the July, 1954, agreement.

fixed tags to the first shipments at his own place of business, which tags carried his house mark "Saunders" along with the trademark "Wrist Rocket." In the early part of 1955 the point of sale boxes, designed by one of defendant's agencies in the fall of 1954, were used. Plaintiff's Exhibit 15 (P–15) exemplifies the type of carton first used. At this same time, Ellenburg ordered and directly paid for a pressure sensitive label bearing the mark which was applied to the then opaque handle of the slingshot—this label also carried Saunders' name with no mention of plaintiff. This label was exchanged in 1956 for a slip of paper bearing a like inscription to be inserted inside of a transparent handle which replaced the opaque one.

As alluded to previously, defendant initially contacted the advertising agencies regarding the design of the point of sale boxes [3] used and continued to do so with one possible exception, and made all decisions relative thereto, and paid for the costs of same. This cost was eventually passed on to the plaintiff through deductions from the total amount owed by defendant for the slingshots, but plaintiff exercised little, if any, control in their design. P–15, one of the first boxes used for individual packaging of the slingshots, made no mention of Ellenburg's company. A later point of sale box, P–18, used somewhere between 1964–68, was designed and printed with the following: "Saunders Super Power WRIST-ROCKET" in large letters. It indicated in smaller printing that it was "manufactured by Saunders Archery Company." P–17, used for approximately one year, around 1966–68, was a hotly disputed piece of evidence. It was virtually the same design as P–18. The only dissimilarity of import here was the fact that the small print said "manufactured for" the defendant "by TRU-MARK MANUFACTURING COMPANY," the successor to Ellenburg's original business. On both P–18 and P–17 there is depicted on the end flaps a proposed target for the slingshot and the proper method for placing the projectile in the leather pouch. Both of these were developed and designed by Ellenburg (P–38). P–19, initially used in 1968–69, was the carton used until the termination of the relationship. It carried no mention of plaintiff, but again included the name Saunders along with the mark.

Saunders attempted to register the mark in March of 1955, but was advised that it was not capable of being registered. He dropped the matter and no further attempts were made to register the mark until Ellenburg's registration was granted in July, 1965.[4] None of the cartons referred to above contained a legend of registration, and Saunders claims he had no knowledge of the registration until 1971, shortly before the business relationship ended. Saunders claims that plaintiff never requested him to put the registration legend on the slingshot point of sale boxes nor otherwise advised him that the mark was registered. Plaintiff had used the (R) legend in advertising in magazines in 1968 and had placed it on the replace-

---

3. Point of sale boxes, as differentiated from shipping cartons, are boxes in which an individual item is packaged for sale by the retailer to the customer. They generally contain the name of the item and other designs or marks to make the item marketable to the public. Shipping cartons are generally just a brown cardboard carton into which a number of the point of sale boxes are packaged and by which the items are shipped to their destination.

4. Plaintiff had attempted to patent the slingshot prior to the parties' starting business together in 1954, and in fact Saunders was under the impression it was patentable at the time the agreement was signed. However, the Gauthier patent was registered a few months prior to plaintiff's application and plaintiff's application was, therefore, denied. After attempting to gain advice from his attorney about the ramifications of plaintiff's manufacturing the slingshot, defendant dropped the matter and an indemnity agreement was executed in October, 1955. In 1965 Saunders sought and obtained an assignment of the Gauthier patent. This patent expired shortly before the termination of the parties' relationship and, in fact, the increased competition was a major factor in the break-up.

ment rubber boxes in 1967–68. Plaintiff procured, printed and paid for these replacement rubber boxes and envelopes all during this time. Plaintiff's name appeared on none.

Throughout the duration of the relationship Saunders also sold two other devices under the name "Wrist Rocket." They were a slingbow, a slingshot device somewhat similar to the slingshot which shot arrows, and a target for the slingshot. Saunders was issued a patent on the slingbow.

All complaints for defects in the products were made to Saunders, who in turn replaced the slingshot or corrected the defect. Saunders would deduct those costs from the total amount due Ellenburg on his deliveries. The evidence shows that Saunders also procured a policy of products liability insurance to cover his liability on the slingshots. Ellenburg contributed to the premiums at certain points during the relationship.

Saunders' first catalog to carry the "Wrist Rocket" slingshot was mailed to jobbers and dealers around January to March of 1955. In it no mention was made of plaintiff as manufacturer of the item. (D–1, Cat. 15). Accompanying the advertising was the inscription: "Another First by SAUNDERS ARCHERY TARGET CO., Columbus, Neb." and underneath that, "Distributed by."[5] Catalogs containing similar advertisements were prepared by Saunders' ad agencies and directly paid for by him throughout the seventeen years herein involved. Prior to 1954 some ten to twenty thousand catalogs were mailed, and by 1971 the amount had increased to some fifty thousand volumes. Some of the depictions used in the catalogs were prepared from Ellenburg. Ellenburg was never contacted about the frequency

or manner of advertising used by Saunders. In addition to the catalogs, trade journals, statement "stuffers" and other mailings to dealers throughout the seventeen years, Saunders in 1955 had copyrighted an instruction booklet to show how the slingshot should be used. The booklet was placed in the boxes along with the slingshot. Ellenburg claims the two collaborated on it and that he was not aware that defendant had copyrighted it. This is disputed, but in either event, it was only used for a very short period of time at the outset of the relationship and was replaced by simple instructions printed on the point of sale boxes. In addition to the aforementioned advertising, Saunders also attempted to gain public acceptance of the slingshot by writing articles in various sporting goods magazines, in trying to develop interest in slingshot clubs, and through the use of movies which demonstrated the use of the slingshot.

The advertising costs expended by Saunders were not separately accounted for. However, he paid for the costs of developing the design on the point of sale boxes and for the printing thereof. These costs were eventually passed on to the plaintiff by a deduction from the amount owed on the slingshots delivered. Plaintiff paid defendant directly for any boxes used by plaintiff for his own shipments to customers.

The dates of plaintiff's first advertisement are not clear. The possible dates include anywhere from 1954 to 1956 as the starting point. In 1956–57, plaintiff advertised in magazines with little success. He resumed advertising in 1966 or 1967 (after he had registered the mark) in nationally recognized publications such as Outdoor Life, Field and Stream, and Popular Mechanics, and

5. Plaintiff contends that this inscription "Distributed by" refers to Saunders. It is unclear whether Ellenburg asserts that as evidence that the public did not identify the origin of the slingshot with Saunders for purposes of showing Saunders did not acquire rights to the mark herein, or as evidence of the relationship of the parties. In either event, the evidence shows that Saunders placed this inscription under his name even as to items which he designed and prepared (D–1, Cat. 16—slingshot target) and defendant's explanation that the inscription was a preface for the inclusion of a dealer's name following it is a credible one.

spent some $1,500 to $1,700 a month for advertising purposes. Plaintiff paid for all of this advertising and defendant did not participate therein except at the very beginning. The evidence shows that plaintiff's sales to defendant and through mail order gradually increased from 1965 until termination.

Ellenburg's son, Steve Ellenburg, who is presently vice president of the business and has been connected with the business from its inception, as early as 1961 made trips to a resort in Colorado to demonstrate the slingshot. From 1962–64, the two Ellenburgs took summer "dealer" trips to advertise and sell the slingshots on a person-to-person basis. All of the boxes used at this time had Saunders' name on them and all re-orders were directed to defendant.

Plaintiff sold the "Wrist Rocket" slingshots on a mail order basis throughout the period involved. This included sales to jobbers and dealers until 1968. These sales were made in boxes carrying the mark along with Saunders' name and all re-orders were directed to Saunders.

As noted previously, a number of changes occurred in the slingshot from the time plaintiff and defendant first met. Plaintiff had experimented with the aluminum tubing frame prior to the agreement in July of 1954. However, the other changes occurred thereafter: thicker rubber padding on the frame, late fall of 1954; change in handle, 1956; method of attaching the surgical tubing to the prongs of the slingshot, 1955–56; method of attaching the leather pouch to the surgical tubing, 1956–57. The evidence is unclear as to which of the individuals instigated these changes. Ellenburg did not start experimenting with aluminum until May of 1954, after the meeting with Saunders. The thickness of the rubber padding was changed at defendant's suggestion although plaintiff undertook arrangements to procure it. No evidence was adduced as to who prompted the change to a transparent handle. Ellenburg claims the method of attaching the surgical tubing to the leather pouch by small clothespin-like objects was developed while he and defendant were traveling in a car to Omaha. The use of soap to slip the tubing over the prongs was changed as a result of the deterioration of the tubing which was brought to defendant's attention and defendant apparently required plaintiff to develop another means as customer complaints were becoming plentiful. A fair inference to be drawn from the times that these changes were made is that they were, for the most part, at defendant's direction. Saunders was attempting to control the quality and appearance of the slingshots that were being sold by, and identified with his archery business.

▪▪▪▪ From the evidence before it, the Court concludes that the right to the trademark "Wrist Rocket" is not exclusively in Ellenburg. Even though Ellenburg and his successor manufactured these devices, they did so under the direct supervision of Saunders. Saunders, through his ad agency, invented the mark in question. The invention of a mark is, for the most part, an inappropriate consideration in determining who has the exclusive right to its use, as priority of adoption and use are the important considerations. Montgomery v. Kalak Water Company of N.Y., Inc., 196 F.Supp. 173, 177 (S.D.N.Y.1961); 3 Callmann, *supra*, § 76.1 at 276. However, the "genesis of the idea is material . . . as throwing light upon the [initial] transaction." Atlas Beverage Co. v. Minneapolis Brewing Co., *supra*, 113 F.2d at 678. From the inception of the use of this mark by sales to the consuming public, the name "Saunders" was used in connection with the mark "Wrist Rocket" and continued to be so used with no mention of Ellenburg or his companies with the exception of a point of sale box claimed to have been used for approximately one year. Of course, defendant cannot defeat an infringement action by claiming that its name accompanied the mark, and therefore there was no deception, Menendez v. Holt, *supra*, 128 U.S. at 521, nor does one *lose*

rights to a trademark by affirmatively placing the name of his customer on the article along with the mark. Shaver v. Heller & Merz Co., *supra*, 108 F. at 824; Lichtenstein v. Goldsmith, 37 F. 359, 360 (D.Mass.1889). But the Court is not presented here with a question of abandonment of the mark "Wrist Rocket." The question it must answer is in whom those rights were first found. The briefs indicate this to be the pivotal controversy.

Although many cases speak of the necessity for the trademark to indicate the "origin" of the article, it is clear that the owner of the mark need not be the manufacturer of that article. "The decisive question is not who manufactured the article sold under a given trademark, but which business or article is symbolized by it." 3 Callmann, *supra*, § 68.2 at 72–73. In finding that a seller or dealer of flour had obtained the exclusive right to a trademark, the Supreme Court stated:

> The brand did not indicate by whom the flour was manufactured, but it did indicate the origin of its selection and classification. It was equivalent to the signature of Holt & Co. to a certificate that the flour was the genuine article which had been determined by them to possess a certain degree of excellence. It did not, of course, in itself indicate quality, for it was merely a fancy name, and in a foreign language, but it evidenced that the skill, knowledge and judgment of Holt & Co. had been exercised in ascertaining that the particular flour so marked was possessed of a merit rendered definite by their examination and of a uniformity rendered certain by their selection. Menendez v. Holt, *supra*, 128 U.S. at 520.

*See also* Electronic Communications, Inc. v. Electronic Components for Industry Co., *supra*, 443 F.2d at 492; Keebler Weyl Baking Co. v. J. S. Ivins' Son, Inc., 7 F.Supp. 211, 214 (E.D.Pa.1934).

Plaintiff contends this is not such a case because Saunders did not control the quality of the slingshot. The evidence does not support such a contention. Plaintiff also contends that since defendant was his distributor the principle is inappropriate. In the absence of a written agreement concerning the use of the mark, and in the absence of a showing that the plaintiff had used the mark previously, the fact that defendant was a distributor does not preclude application of *Menendez*.

Plaintiff did not license defendant to use this mark when the parties started to deal together. The mark had not yet been invented, let alone been adopted and used by the plaintiff. Defendant was the first to affix tags on the slingshots in 1954 after the name was invented. These slingshots were sent to dealers and jobbers from Saunders' company, identified as his products, and he was the one looked to when the "Wrist Rocket" proved defective. As far as the public was concerned Ellenburg's company was practically unknown. Although one may not *lose* rights to a trademark because the public is unaware of one's identity, Shaver v. Heller & Merz Co., *supra*, 108 F. at 824, when determining who *initially acquires* those rights that question is significant. In Distillers Brands v. American Distilling Co., *supra*, the court found that a whiskey distributor had acquired rights to a trademark over the bottler who had invented the mark and applied it to the bottles before delivering them to defendant.

> So far as consumers were concerned, the distillers and the bottler were anonymous. The King's Pride whiskey had only the sponsorship of the King Company as distributor. Where a trademark indicates a distributor of merchandise rather than the maker, it is the distributor who acquires the trademark rights. *For the public associates the goods so marked with the distributor and knows not the identity of the maker. Id.*, 26 F.Supp. at 989 (Emphasis added.)

Again, in Atlas Beverage Co. v. Minneapolis Brewing Co., *supra*, 113 F.2d at 678, the Eighth Circuit in resolving a

dispute over who was entitled to a trademark, considered, *inter alia*, evidence that the owner designed and adopted the label, that its name was on the labels and the name of the other party was not, and that it held itself out to the public as owner of the trademark.

The Court finds that (1) Ellenburg had no prior right to the mark when he and Saunders started their relationship; (2) that there was no agreement between them concerning the use of the mark; (3) that Saunders invented the mark and first affixed it to the slingshot in the fall of 1954 as Ellenburg's distributor; (4) that the defendant maintained the quality and uniformity of the slingshot through supervision of the item and recommended changes in its construction; (5) that the public bought the items on the reputation and responsibility of the defendant without knowledge of the plaintiff and identified its origin with the defendant.[6]

Therefore, the Court finds that defendant adopted and used this mark prior to any use thereof by the plaintiff. The circumstances and facts of this case compel the conclusion that the only use being made of the mark by the plaintiff prior to and at the time of its registration was as an implied licensee of the defendant. Plaintiff was allowed to ship a number of the slingshots through mail orders and to use the carton designed by defendant to facilitate the sales. However, there is no evidence to support a finding that defendant's consent for plaintiff to use the mark in conjunction with those sales was uncontrolled or otherwise resulted in a loss to the defendant of the exclusive right to use that mark which it obtained by prior adoption and use.

The law is clear that Ellenburg acquired no rights to the trademark solely by its registration in 1965 and the facts

show that, with the exception that plaintiff was the registered owner after that date, its use of the mark was virtually under the same circumstances as it was prior thereto, that is, as defendant's licensee with permission to use the mark in conjunction with the sale of the slingshots which it manufactured. There is no evidence that the defendant abandoned or otherwise lost its rights as exclusive owner of the mark through any actions of the parties after 1965, the plaintiff continuing as an implied licensee. Menendez v. Holt, *supra*, 128 U.S. at 524. Plaintiff's right to use the mark as an implied licensee of the defendant terminated when the relationship of the parties terminated. The only use made by the plaintiff independent of the defendant was after that date.

From the foregoing, the Court not only finds that plaintiff's infringement action must fail, but also that Registration No. 792,882 must be cancelled pursuant to the authority granted this Court under 15 U.S.C. § 1119. Plaintiff has never acquired a right to use this mark and its mere registration did not create such a right. In the absence of the affidavit of incontestability previously mentioned, there is no doubt that the Court could order cancellation on the findings of prior use alone. Blanchard Importing & Distributing Co. v. Charles Gilman & Sons, Inc., 353 F.2d 400, 401 (1st Cir. 1965), cert. denied, 383 U.S. 968, 86 S.Ct. 1273, 16 L.Ed.2d 308 (1966). The incontestability affidavit puts a different light on the status of the parties, however. 15 U.S.C. § 1115. But the Court does not find that it alters the result in the present case.

The right to use a registered mark does not become incontestable against one who claims infringement of a valid right acquired prior to the publication date of the registered mark.

6. Plaintiff indeed spent large sums in advertising this product. However, although such activity is certainly an attendant and legitimate trademark function, it in itself does not qualify as the adoption and use which

fixes the right to the mark's use, nor overpower otherwise vested and existing rights to the mark. Sweetarts v. Sunline, Inc., 380 F.2d 923, 928 (8th Cir. 1967). *See generally,* 3 Callmann, *supra,* § 76.2(e) at 290–291.

Such a prior right may prevent or limit the incontestability, depending upon the rights and equities of the parties involved.

4 Callman, *supra,* § 97.3(c)(3) at 605–606.

In addition to the above statement of authority in this area, 15 U.S.C. § 1065 itself makes this qualification on the application of the affidavit. The mark becomes incontestable in favor of a registrant after five years:

[E]xcept to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark . . . continuing from a date prior to the date of publication under this chapter of such registered mark . . . .

The use of the mark "Wrist Rocket" by plaintiff herein was, first of all, not a legal "use" recognized by the trademark law as it and its predecessors were only implied licensees, but even the use as it was cannot oust the defendant's rights to the mark. The incontestability affidavit cannot aid the plaintiff as against the defendant in this case. Therefore, the Court finds that the Commissioner of Patents shall cancel the present registration in plaintiff's name and should issue one to the defendant upon proper application therefor. *See* Massa v. Jiffy Products Co., 240 F.2d 702, 707 (9th Cir.), cert. denied, 353 U. S. 947, 77 S.Ct. 825, 1 L.Ed.2d 856 (1957).

## BREACH OF FIDUCIARY DUTY— TERMINATION OF RELATIONSHIP

Next, plaintiff contends that defendant breached a fiduciary duty owned to plaintiff by failing to give plaintiff a reasonable notice of termination of their relationship and by selling certain replacement rubbers during their relationship which were not manufactured by plaintiff.

As to the sale of the replacement rubbers, the Court finds that there is evidence to sustain the allegation that such sales occurred prior to the termination of the relationship. In 1968, defendant developed what he considered to be an "improved" method of constructing the pouch assembly which connected to the rubbers and was sold along with them. It consisted of a plastic, one-piece pouch assembly to replace the three-piece leather assembly manufactured by plaintiff. A patent was applied for on this pouch in July of 1968 and issued in May of 1970. Steven Ellenburg testified that he saw a slingshot in Saunders' home sometime in the summer of 1970 which incorporated this new pouch assembly. Saunders admitted that he did sell the plastic pouch assembly about four to six months prior to the termination of the arrangement.[7] Although Saunders had been distributing replacement parts manufactured by Ellenburg, plaintiff has shown nothing that would indicate a duty to sell Ellenburg's replacement parts exclusively. Sven if such a duty were found, plaintiff has failed to prove his allegations that Saunders breached this duty by selling his own replacement parts instead of Ellenburg's.

Regarding the claim that the relationship was terminated on too short of notice, a succinct review of the facts is in order. The Gauthier Patent that Saunders had acquired in 1965 expired in 1969. This precipitated increased competition in the arm-brace slingshot market and defendant sought to negotiate a lower sale price from Ellenburg which price was based upon a production analysis computed by Saunders' son. Defendants testified that the lower price could have been attained by streamlining the production of the units and that with this streamlining the cut in cost would have been reasonable and that they were willing to help plaintiff with this area. Plaintiff asserts that the de-

7. (Tr. at 417–18).

fendant simply wanted a cut in cost based on volume selling and it was in no position to grant such a cut. No agreement was reached and on October 19, 1971, plaintiff was notified that the business relationship would terminate in thirty days. Plaintiff immediately sought a new outlet for the slingshot and by December 10, 1971, had executed a distributorship contract with the Iowa dealer with whom it had dealt prior to the relationship with the defendant. Plaintiff asserts that it was entitled to more than thirty days' notice of termination whereas defendant contends thirty days' notice was sufficient.

Plaintiff's claim rests on its position that the relationship between it and the defendant was a distributorship or sales agency and that, as such, a reasonable notice of termination was implied and the thirty days was not reasonable, particularly in light of the time of year that it was given, such time being a crucial season for advertising and marketing the slingshots. On the other hand, the defendant contends that the relationship of the parties was not a distributorship but was merely a buy-sell agreement, indefinite in time, and terminable at the will of either party without cause. It further contends that, in fact, a cause did exist because plaintiff arbitrarily refused to negotiate a lower price when it realized that the increased competition forced upon the defendant may cause the defendant to stop doing business with it unless that price was lowered. Further, the defendant contends that the thirty days was sufficient as that was the period previously agreed upon in the 1964 agreement (which was never accepted by the defendant). The Court is of the opinion that the relationship of the parties throughout the seventeen years of their doing business was more than a buy-sell agreement as suggested by the defendant. On the other hand, the evidence does not support a finding that defendant was plaintiff's agent in the strict sense. To determine the type of relationship that existed between these parties in 1971, the Court must look to various factors as there was no written agreement defining their relationship in 1971 and there had not been such a written agreement since 1964. But the plaintiff asks the Court to look to the terms of the 1954 agreement as some evidence of the relationship that existed at all times during this seventeen year period. The Court finds that both parties deemed the 1954 agreement as controlling their initial business relationship even though it referred to the "Howard Wrist Locker Slingshot" as opposed to the "Wrist Rocket" and even though its terms were not precisely followed. The defendant contends to the contrary, but in the correspondence between the parties in the 1964 negotiations, defendant implicitly acknowledged the existence of the 1954 agreement and made no intimation that it had not been in effect for the previous ten years for the "Wrist Rocket" and in fact referred to portions of that 1954 agreement as allegedly breached by the defendant during the previous ten years. As noted, the 1954 agreement clearly was not followed to the letter. That agreement granted defendant the exclusive agency for distribution and sale of the "Howard's Wrist Locker Slingshot" and delineated the obligations of the parties, to wit: plaintiff was to retain a right to advertise and sell to retailers but could not sell to dealers and jobbers; plaintiff was to supply defendant with the units boxed and ready for shipment. Defendant was to present the items to dealers, wholesalers and the trade in general through advertising, showings, etc., and was to receive a twenty-five per cent commission on all sales, computed on the consumer price less forty per cent, less twenty-five per cent, less two per cent if cash discounts were taken. Accounts were to be determined monthly and net amounts transferred to the plaintiff. The agreement was for five years, automatically renewable for another five unless notice to terminate was given prior to the expiration of the original five-year term. The

agreement also stated that "this instrument is not revocable during said term except at the express consent of both parties to this agreement." In fact, the defendant was not paid on a commission basis and Ellenburg did not furnish the boxes for shipment although he did deliver them to defendant's place of business already boxed. No discounts were paid and plaintiff kept no records of the defendant's sales or selling programs but rather plaintiff was paid monthly on the basis of sales slips prepared each time he delivered the units to the defendant's place of business. However, the evidence clearly shows that the pay formula utilized throughout the relationship was essentially the same as the one defined in the agreement and plaintiff did not sell to those whom he was forbidden to do so, except on a few occasions which terminated upon defendant's reprimand. Therefore, whether the 1954 agreement was followed in all aspects or not, the actions of the parties between 1954 and 1964 show that they deemed the portion of the agreement that gave defendant the exclusive right to sell to a certain portion of the job market an effective aspect of their relationship.

The reason the terms of the 1954 agreement and the actions of the parties during the 1954 to 1964 term are important in the Court's consideration of the type of relationship involved in 1971 is because after 1964 no written agreement was entered into and the parties carried on their business for the following years under substantially the same relationship as they had prior to that time. That is, plaintiff continued to manufacture the "Wrist Rockets" and box them in boxes furnished by the defendant and deliver them to the defendant's place of business. The plaintiff continued to refrain from selling to those that were within the defendant's exclusive market for the most part and in a few instances that plaintiff did encroach upon this market, he was reprimanded by the defendant and ceased doing so. The de-

fendant continued to present the product to the archery trade by various methods throughout this term as he had done previously. At no time during the seventeen years did the defendant have a quota to sell and he continued to sell other products at all times, including those manufactured by his company and others. On at least one occasion, the defendant changed the retail price without consulting the plaintiff, although the increase was eventually noted by and passed on to plaintiff. Defendant attempted to protect himself by obtaining an assignment of the patent on the slingshot in 1965 and by purchasing liability insurance on the product, evidencing his view that the risk was on him in the event of legal complications arising from the sale of the slingshot. In general, the defendant controlled the changes that occurred in the design of the Wrist Rocket throughout this time and essentially controlled the marketing of all the units delivered to him.

A review of the foregoing facts shows that no strict agency relationship existed at any time throughout the period of these individuals' dealings. As stated in Restatement, (2d) Agency § 14J:

> One who receives goods from another for resale to a third person is not thereby the other's agent in the transaction: whether he is an agent for this purpose or is himself a buyer depends upon whether the parties agree that his duty is to act primarily for the benefit of the one delivering the goods to him or is to act primarily for his own benefit.

Comment (b), to the above section, sets forth certain recognized indicia of a buyer-seller arrangement over that of agency. Those factors aligned against the circumstances of this case certainly show that Saunders was acting for his own benefit in selling the goods as opposed to simply selling them for the benefit of Ellenburg. This would mitigate in favor of a buy-sell arrangement rather than agency. On the other hand, the arrangement between Ellenburg and

Saunders clearly envisioned Saunders' efforts in the marketing of the slingshot for Ellenburg who had no marketing experience and to that extent they were delivered to Saunders for Ellenburg's benefit also. Thus, the Court does not find that this was a pure buy-sell arrangement. The arrangement existing in 1971 was essentially one whereby the plaintiff as manufacturer would deliver the slingshots to the defendant as his distributor, the latter to use his best efforts to sell and advertise the product for the benefit of both individuals, Saunders having the sole market for the slingshots to certain customers. As such, the relationship was one adapted to the unique abilities of each party. In J. C. Millett Co. v. Park and Tillford Distillers Corp., 123 F.Supp. 484, 492 (N.D.Cal.1954), the court recognized that a similar business relationship had characteristics of both agency and sale.

> The distributorship contract in the case at bar is more than a contract of employment or agency. It is also a contract of sale. On the other hand, it is more than a mere sales contract. It partakes of the substantial aspects of both. (Footnote omitted.)

*See also* Bendix Home Appliances v. Radio Accessories Co., 129 F.2d 177, 181 (8th Cir. 1942) (applying Nebraska law); Consolidated Theaters v. Theatrical Stage E. U., L. 16, 69 Cal.2d 713, 73 Cal.Rptr. 213, 447 P.2d 325, 335 (1968); C. C. Hauff Hardware, Inc. v. Long Manufacturing Co., 257 Iowa 1127, 136 N.W.2d 276, 278 (1965); Des Moines Blue Ribbon Distributors, Inc. v. Drewrys, Ltd., U. S. A., 256 Iowa 899, 129 N.W.2d 731, 736 (1964); California Wine Association v. Wisconsin Liquor Co., 20 Wis.2d 110, 121 N.W.2d 308, 316 (1963). *See generally* Williston on Contracts, Section 1017A at 137–138 (Jaeger, 3d ed. 1967); Annotation, 19 A.L.R.3d 196, et seq. (1968).

In situations where such a relationship exists and there is no provision in the agreement for termination, courts have determined that there is implied in said agreements a reasonable duration and a right to reasonable notice of termination. In Elson & Co. v. Beselin & Son, 116 Neb. 729, 735, 218 N.W. 753 (1928), the Nebraska Supreme Court stated as follows:

> The contract of agency being indefinite as to the time it was to run, what was its duration? Where the continuation of a contract is without definite duration the law implies a reasonable time, and what is a reasonable time is to be determined from the general nature and circumstances of the case. When the obligor has expended a substantial sum of money or value or has substantially rearranged his business, as in this case, preparatory to engaging upon the terms of agreement for the benefit of obligee, he ought, through fairness, to have a reasonable time and notice of the cancelation [sic] of the contract in order that he might have a reasonable opportunity to put his house in order.

*See also* Ansbacher-Siegle Corp. v. Miller Chemical Co., 137 Neb. 142, 147, 288 N.W. 538 (1939). The above cases were dealing with situations where the distributor was suing for an untimely cancellation of the distributor contract. However, the rules applicable for reasonable notice of termination appear to be as applicable to the manufacturer as they are to the distributor. As stated in California Wine Association v. Wisconsin Liquor Co., *supra*, 121 N.W.2d at 317:

> From the standpoint of the parties to an exclusive distributorship contract the factual necessity for requiring reasonable notice is greatly enhanced. *The manufacturer should receive reasonable notice of termination in order to locate another distributor in the area for his products or to seek other arrangements;* the distributor should have reasonable notice in order to make the transition from an exclusive distributor to a non-exclusive distributor or to conduct other transactions relative to his business. (Emphasis supplied.)

Although the business arrangement between Ellenburg and Saunders may not neatly fall within the definition of an exclusive distributor or exclusive sales agency, it certainly was more than a buy-sell agreement and the Court deems that implicit in that arrangement was a requirement that each party give the other reasonable notice of an intention to terminate. In this situation, the parties had dealt in substantially the same manner for seventeen years. The plaintiff's sole outlet to dealers and jobbers was exclusively through the defendant. Similarity of the quandries between Ellenburg in this case and the distributors in the other cases cited needs no further amplification. In both instances, the complaining parties were dependent upon their cohorts to respectively sell or deliver. Since the Court deems the above rules applicable to the present situation, the next question becomes what was reasonable in light of the circumstances of this case. The arrangement in effect in 1971 had continued essentially from 1964 when the 1954 agreement terminated by its own terms and the parties failed to reach agreement on a new contract. The Court, therefore, finds that any right to a reasonable duration was not breached by the defendant in this case. However, as to the reasonable notice of termination, a different question arises. Defendant contends that the thirty days was sufficient notice, particularly in light of the fact that plaintiff refused to negotiate a lower price to the defendant for slingshots. Defendant's reference to the 1954 agreement and the thirty-day termination clause therein is of little benefit in this case. A close reading of that agreement shows that the thirty-day termination provision was only applicable if the parties did not wish the automatic renewal clause to come into effect. Subsection (a) of the first paragraph specifically provides that during the term of five years, the instrument was "not revocable" except at the express consent of both parties. Thus, the thirty-day provision in the 1954 agreement does not carry the weight that defendant claims. Little evidence was presented to the Court as to what a reasonable notice of termination would have been under the facts and circumstances of this case. From a reading of the above cases, however, it appears to this Court that said notice depends on the peculiar facts and circumstances of each case. For instance, in J. C. Millett & Co., *supra*, the Court found that a reasonable period of duration was one year and that the notice of termination should be at least three months prior to the intended terminating date. In the present case, the parties had dealt for ten years under the 1954 agreement and for nearly seven years under the 1964 oral agreement. The extensive duration of this business arrangement certainly required more than a summary thirty-day notice that the prior seventeen years of dealing was to completely end. The Court finds that a reasonable notice of termination under the facts and circumstances of this case should have been three months prior to the date the arrangement was to actually terminate. The Court notes that even though the plaintiff's refusal to lower its price might otherwise be found to be sufficient cause to bring the business arrangement to a close, the fact that differences in pricing the unit had arisen throughout the seventeen years and had always been settled in some point or another between the parties, still leads it to the conclusion that failure to agree on reduction in the cost was not sufficient cause to *summarily* terminate the relationship on thirty days' notice.

## DAMAGES UNDER SECTION 1120

The Court has previously referred to defendant's prayer for cancellation of plaintiff's registration. Defendant also asks the Court to award damages under 15 U.S.C. § 1120 which provides for such action if a registration was procured by false or fraudulent statements. Before Ellenburg can incur liability under this provision, Saunders

must present sufficient evidence to support a finding that Ellenburg procured registration by a declaration or representation that was incorrect or a wilful attempt to mislead the patent office. Schwinn Bicycle Co. v. Murray Ohio Mfg. Co., 339 F.Supp. 973, 984 (M.D. Tenn. 1971), aff'd, 470 F.2d 975 (6th Cir. 1972). The basis for defendant's claim of falsity and fraud are various statements made by plaintiff in his initial application for registration and in his filings regarding the incontestability affidavit. In the application for registration plaintiff stated that the mark had first been used on goods on September 30, 1954, and was first used in interstate commerce in October of 1954. He further stated under oath that he "believes himself to be the owner" and "to the best of his knowledge and belief" no one else had the "right to use" the mark in commerce. He attached a specimen of the mark which had been taken from a point of sale box. The Saunders name had been cut off. In July of 1971 plaintiff submitted an affidavit under Section 15 of the Act, 15 U.S.C. § 1065, wherein he stated that "Howard F. Ellenburg, d/b/a Tru-Mark Manufacturing Company" was the owner of the mark and the mark had "been in continuous use . . . for five consecutive years. . . . ." [8]

Saunders claims the references set forth in plaintiff's initial application were false and fraudulently made because plaintiff knew that Saunders was using the mark at the time the application was submitted. Thus, the failure to apprise the Patent Office of defendant's use, and in that regard, the cutting of the specimen, are asserted by defendant to require the inference that plaintiff wilfully attempted to mislead the Patent Office and procure the registration thereby. As to Ellenburg's assertion in the application that he believed himself to be the owner of the mark and that no one else had a right to its use, the Court does not find this pronouncement as to plaintiff's *belief* dishonestly made. Merely because he knew Saunders was using the mark at that time is not tantamount to any *right* to its use. In fact, failure to mention the defendant as an owner or one with the right to the mark was entirely consistent with the theory that was presented in this Court that Saunders' use of the mark during this whole period was only for the plaintiff and that Saunders had no rights to the mark. The Court does not find the statement as one intended to deceive or mislead, nor an otherwise false statement of Ellenburg's belief at the time made.

The next item to which defendant attaches a fraudulent intent is the specimen which is submitted along with the application. Plaintiff's application stated:

> The mark is used by applying it to boxes, containing slingshots, the mark being printed thereon, and five specimens showing the mark as actually used are presented herewith.

This was in fact a false statement since the mark was not actually used without Saunders' name accompanying it. The defendant does not contend that plaintiff had any obligation to submit this specimen, but since it was submitted, it should have reflected the truth, and in the absence thereof it was a material omission and misled the Patent Office. The omission of Saunders' name and the failure of the plaintiff to otherwise state at any point in its application that the defendant Saunders was using the name is submitted as support of a finding of wilful attempt to mislead on the part of Ellenburg.

8. Defendant's contention that plaintiff's Section 15 affidavit filed in July of 1971 was false and fraudulent is found by this Court to have no bearing on its claim for damages under Section 1120. This affidavit was not made to procure the registration and thus the very language of Section 1120 renders it immaterial in this connection. The Court, however, notes that no fraud was shown in conjunction therewith.

As stated above, Section 1120 is phrased in the disjunctive. Either false *or* fraudulent statements used to procure the registration are within its purview. Simmonds Aerocessories, Ltd. v. Elastic Stop Nut Corp., 158 F.Supp. 277 (D.N.J. 1958).

In order for a declaration to be considered fraudulent, it is well established that the declarant must have made a false statement of fact with knowledge of the falsity at the time of the declaration. DeMert and Dougherty, Inc. v. Chesebrough-Ponds, Inc., 348 F.Supp. 1194, 1197 (N.D.Ill. 1972).

The defendant has failed to show the direct and convincing evidence required for a finding of fraud. Ellenburg's statement as to the attached specimen as one actually used has not been shown to have been made with knowledge that it was false. Even if Ellenburg had known that Saunders' name was going to be cut off of the point of sale cartons, which the evidence directly contradicts, it has not been shown that he was aware that its omission contravened the technical requirements of trademark applications. *See, e. g.,* Schwinn v. Murray Ohio Mfg. Co., *supra,* 339 F.Supp. at 983. The Court finds that there was no evidence of fraud on Ellenburg's behalf nor any other evidence of bad faith because the specimen did not contain Saunders' name.

 As to the falsity of this statement, however, the Court agrees with the defendant's contentions. The name was not actually used as the altered specimen indicated. The Court is constrained, therefore, to find that falsity did exist in the plaintiff's application and defendant is entitled to recover "any damages sustained in consequence thereof." 15 U.S.C. § 1120; Landstrom v. Thrope, 189 F.2d 46 (8th Cir.), cert. denied, 342 U.S. 819, 72 S.Ct. 37, 96 L.Ed. 620 (1951). However, the Court does not find that defendant's request for attorney's fees and related expenses is proper in this case. As noted in DeMert

and Dougherty, Inc. v. Chesebrough-Ponds, Inc., *supra,* 348 F.Supp. at 1199:

> [A]ttorney's fees and related expenses have been awarded under 15 U.S.C. § 1120 (1970) only in those cases where the false registrant could have had no bona fide belief in the validity of his claim and consequently acted fraudulently.

As pointed out above, the Court does not find that Ellenburg acted fraudulently in this case nor that he did not have a bona fide belief in his right to the mark. Additionally, the case of Merry Hull & Co. v. Hi-Line Co., 243 F.Supp. 45 (S.D. N.Y.1965), and cases similar thereto are sufficiently distinguished from the present case in DeMert and Dougherty, Inc. v. Chesebrough-Ponds, Inc., *supra,* in that fraud and harrassment were found to exist. That clearly was not the case in this matter.

## UNFAIR COMPETITION AND DECEPTIVE TRADE PRACTICES

Defendant next seeks injunctive relief and damages for plaintiff's use of the mark after the termination of their relationship in November of 1971 and for its actions taken thereafter.

On November 15, 1971, a letter was sent to dealers and jobbers from attorneys purporting to represent Wrist Rocket Manufacturing Company informing them of the termination of its relationship with Saunders Archery Company and generally pointing out that the slingshot had been developed by Howard Ellenburg and would continue to be manufactured and sold by Wrist Rocket Manufacturing Company through another dealer. It informed them that Saunders was no longer authorized to use the mark "Wrist Rocket."

At approximately this time, a letter was also sent by Howard Ellenburg himself, as president of Wrist Rocket Manufacturing Company, in which it was explained that Saunders Archery Company no longer was authorized to sell any product with the Wrist Rocket mark and

informing the recipients of the letter that Wrist Rocket Manufacturing Company was in the process of suing Saunders Archery Company for continuing to use the mark. The letter encouraged dealers and jobbers to buy only genuine Wrist Rocket products which only Wrist Rocket Manufacturing Company had the right to sell.

These letters generated follow-up letters to Saunders Archery Company from dealers and jobbers indicating their understanding that they could no longer obtain Wrist Rockets from Saunders and inquiring as to whether the latter had any quantities of the slingshots that it wished to close out. Saunders replied to such letters by informing them that the letters from Wrist Rocket Manufacturing Company and its attorneys had misinformed them and that Saunders Archery Company was "very much in the Wrist Rocket business" and could supply them as it had in the past.

The agreement by plaintiff was signed by Durapak corporation on December 10, 1971. Shortly thereafter, Durapak proceeded to send letters to the effect that it had recently been appointed the exclusive agent for sale of Wrist Rocket and that all future sales of the original Wrist Rocket would be handled by it rather than Saunders Archery Company. The evidence is clear that this precipitated some instances of payments being directed to Durapak when they should have been made to Saunders, although there is no evidence that they were not passed on to Saunders. Saunders claims that this activity on the part of Ellenburg in selling products under the name Wrist Rocket after their relationship terminated and the change of the corporate name from Tru-Mark Manufacturing Company to Wrist Rocket Manufacturing Company, along with the letters sent by plaintiff and its attorneys to various dealers, constituted unfair competition and deceptive trade practices under the Nebraska Uniform Deceptive Trade Practices Act, Sections 87–301 et seq., Neb.R.R.S. 1943 (Reissue 1971). The defendant also points out that when the above letters were sent, the name of Ellenburg's corporation had not yet been changed to Wrist Rocket Manufacturing Company and in fact, the name change was not officially recorded until January 25, 1972, after the filing of this suit.

The Court finds that plaintiff's action did cause confusion and that the letters sent by plaintiff or its agents did make representations that the Wrist Rocket Manufacturing Company, which was not even in existence at that time, had the status of owner of the mark "Wrist Rocket" which it clearly did not have, all in violation of Section 87–302(a), Neb.R.R.S.1943, and that the use of the corporate name Wrist Rocket Manufacturing Company by plaintiff constituted unfair competition. The Court thus finds that defendant is entitled to a permanent injunction against plaintiff's continued use of the mark Wrist Rocket in any manner in conjunction with arm-brace slingshots or replacement rubbers sold incidental thereto. It further finds that plaintiff's continued use of the corporate name, Wrist Rocket Manufacturing Company would be a deceptive trade practice and unfair competition and thus finds that said name shall be changed to one not confusingly similar thereto within sixty (60) days from the date hereof. Section 87–303(a), Neb.R.R.S.1943.

As to any other damages that Saunders Archery Company may have incurred from plaintiff's use of the mark from January 19, 1972,[9] to the present,

9. As noted above, defendant's termination of the business relationship on thirty days' notice was improper. The Court found that three months was a reasonable notice of said termination. Thus, the notice having been given on October 19, 1971, the relationship did not properly terminate until January 19, 1972. The plaintiff, therefore, did not infringe upon defendant's mark nor engage in unfair competition by the independent use of the mark until after that date as it had an implied license to use said mark during the term of the relationship.

the Court will hear evidence thereon at a time to be set by further order of the Court.

 Attorneys fees will not be allowed under the provisions of the Nebraska Uniform Deceptive Trade Practices Act as the Court finds no evidence that plaintiff wilfully engaged in the above-mentioned activities knowing them to be deceptive, but quite to the contrary, based its acts and position on a colorable theory of right to use the mark. Although the use of the name Wrist Rocket Manufacturing Company before the corporate name was changed was somewhat overzealous on the part of the plaintiff, the Court does not infer fraud therefrom. Section 87–303(b), Neb.R.R.S.1943.

As to costs, the Court finds that the circumstances of this case do not require such an award and each party shall bear its own costs of this action.

In conclusion, the Court finds as follows:

1) Plaintiff's action for trademark infringement and unfair competition has not been sustained by the evidence and must fail;

2) Plaintiff's cause of action for breach of fiduciary duty is sustained and plaintiff is entitled to any and all damages directly resulting from said breach;

3) Defendant is the exclusive owner of the trademark "Wrist Rocket" as used in the sale of arm brace slingshots and replacement rubbers therefor;

4) Registration No. 792,882 issued to plaintiff's predecessor in interest is hereby cancelled and the Commissioner of Patents is ordered to issue a registration of the mark "Wrist Rocket" to Saunders Archery Company upon proper application therefor.

5) Plaintiff has infringed upon defendant's trademark by its use of the mark "Wrist Rocket" after January 19, 1972, and has engaged in deceptive trade practices and unfair competition through its actions following said date. Therefore,

a) Plaintiff is permanently enjoined from using the corporate name "Wrist Rocket Manufacturing Company, Inc." or any name confusingly similar thereto;

b) Plaintiff is permanently enjoined from using the trademark "Wrist Rocket" in any manner on arm-brace slingshots or replacement rubbers;

c) Defendant is entitled to any damages directly resulting from plaintiff's use of the trademark "Wrist Rocket" which can be shown to have been actually sustained from said use after January 19, 1972.

6) Defendant is entitled to any and all damages actually sustained as a consequence of the false statements contained in plaintiff's application for registration of the trademark "Wrist Rocket" excepting attorneys fees and related costs as more fully explained hereinabove.

7) The practices of plaintiff subsequent to the termination of the relationship were not with knowledge of their deceptiveness and no attorneys fees will be awarded. Additionally, the Court finds that each party shall bear their respective costs of this action.

A hearing shall be held on further order of the Court on the issue of damages on those causes referred to above to which said issue remains for decision, to wit: Items 2, 5(c) and 6.

A separate order will be entered this day in conformity with this Memorandum Opinion.