GENERAL BUSINESS SERVICES, INC.

v.

G. Parke ROUSE, III, Titan Business Systems and Pegboard Systems, Inc.

Civ. A. No. 79–2911.

United States District Court,
E. D. Pennsylvania.

July 15, 1980.

Steptoe & Johnson by Roger E. Warin and Paul J. Ondrasik, Jr., Washington, D. C., Philip M. Hammett, Philadelphia, Pa., for plaintiff.

C. Oliver Burt, III, Philadelphia, Pa., for defendants.

## MEMORANDUM OPINION

BECHTLE, District Judge.

Presently before the Court is the motion of plaintiff General Business Services, Inc. ("GBS"), for a preliminary injunction against defendants G. Parke Rouse, III ("Rouse"), Titan Business Systems and Peg-board Systems, Inc. (All references herein-after to "defendant Rouse" shall pertain, collectively, to G. Parke Rouse, III, Titan Business Systems and Pegboard Systems, Inc.) For the reasons set forth below in the Court's findings of fact and conclusions of law, the motion of the plaintiff will be granted in part and denied in part.

## FACTUAL BACKGROUND

The legal controversy presently before the Court arose out of a business arrangement between defendant Rouse and GBS that was entered into in the spring of 1973 and subsequently terminated in June of 1979. GBS, a Maryland corporation, is in the business of providing business and accounting supplies, advice and related support services to businesses throughout the United States. These products and services are dispensed by GBS through a network of some 1,000 franchised regional and field directors. In addition, GBS provides nationwide advertising and marketing promotion to effectuate the sales of their services and products. Rouse, through his wholly owned and controlled Pennsylvania corporations, Titan Business Systems and Pegboard Systems, Inc., develops and sells various business recordkeeping and accounting forms and supplies to both distributors and directly to businessmen. In this case, Rouse developed and sold to GBS various business forms and supplies at the request of GBS, in accordance with its particular needs. GBS then sold these products to its franchisees who, in turn, sold them at retail. While orders were placed with, processed, billed and collected by GBS, the systems and related supplies themselves were in many cases shipped directly by Rouse to GBS franchisees after Rouse received the materials from his printer, Eastern Systems, Inc. As a result, Rouse only maintained a limited inventory of supplies and forms. Rouse was also engaged by GBS to instruct GBS franchisees at GBS-sponsored seminars and training sessions in the use of the products and services that Rouse was furnishing.

One group of products, known as peg-board recordkeeping combination payroll-

cash disbursement forms and systems, is especially pertinent to this case. These systems involve the use of shingled checks and receipts affixed to a metal pegboard. When the user writes a check or a receipt, a duplicate of his entry is simultaneously made on a ledger card, or on a cash receipts or disbursements journal through the phenomenon of treated paper affixed to the metal pegboard. From 1974 until his termination in June of 1979, Rouse was the exclusive supplier to GBS of these pegboard systems and supplies.

## REQUIREMENTS FOR A PRELIMINARY INJUNCTION

In order to determine whether a preliminary injunction should be granted, the following four factors must each be separately examined and balanced:

(1) whether the applicant has shown a reasonable likelihood of ultimate success on the merits;

(2) whether the applicant has demonstrated that irreparable injury, *pendente lite*, will be suffered unless injunctive relief is granted;

(3) the possibility of harm to third parties if relief is granted; and,

(4) the public interest.

*Constructors Ass'n of Western Pa. v. Kreps*, 573 F.2d 811, 814–815 (3d Cir. 1978).

The Court finds that the plaintiff is entitled to relief. Inasmuch as the injunctive relief sought by the plaintiff takes several forms and revolves around separate factual actions taken by defendant Rouse, all stemming from his business arrangement with GBS, the Court will discuss each claim for injunctive relief separately.

I. *List of GBS Franchisees as a Trade Secret*

The plaintiff claims that injunctive relief is necessary on the ground that the defendant has illegally misappropriated a trade secret from the plaintiff in the form of a

listing of GBS franchisees prepared by the plaintiff and provided to the defendant while he was associated with GBS. The defendant still retains this list and is using it to contact GBS franchisees named in the list in order to solicit sales for his own products. Rouse has refused to return this list to the plaintiff after being requested to do so by GBS. The list contains the names, addresses (home and office), phone numbers and zip codes of all GBS franchisees nationally who held such positions at the time that GBS terminated its business relationship with Rouse in June of 1979. The franchisees are the primary purchasers of GBS products and services because customer sales are only made through these same franchisees. The plaintiff maintains that these lists, which are updated monthly, are only provided to persons within or associated with the GBS organization on a "need-to-know basis" and have been compiled only as an end result of GBS's extensive and expensive advertising and marketing efforts promoting the sales of its franchises.

■ The major judicial pronouncement by the Supreme Court of Pennsylvania in the area of misappropriation of customer lists as trade secrets, binding in this action,[1] was in *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838 (1957), which held:

In many businesses, permanent and exclusive relationships are established between customers and salesmen. The customer lists and customer information which have been compiled by such firms represent a material investment of employers' time and money. This information is highly confidential and constitutes a valuable asset. Such data has been held to be property in the nature of a "trade secret" for which an employer is entitled to protection, independent of a non-disclosure contract, either under the law of agency or under the law of unfair trade practices.

---

1. Trade secret misappropriation cases are governed by state tort law. *Midland-Ross Corp. v. Sunbeam Equip. Corp.*, 316 F.Supp. 171, 177 (W.D.Pa.1970), *aff'd per curiam*, 435 F.2d 159 (3d Cir. 1970).

136 A.2d at 842 (footnote omitted). *See also United Insurance Co. of America v. Dienno,* 248 F.Supp. 553, 558 (E.D.Pa.1965).

■ There are, however, two court-created exceptions to the general rule that customer lists are trade secrets. First, customer lists are not trade secrets if they can be easily or readily obtained through some other independent source. *See Van Products Co. v. General Welding & Fabricating Co.,* 419 Pa. 248, 213 A.2d 769, 777 (1965); *Denawetz v. Milch,* 407 Pa. 115, 178 A.2d 701, 704–705 (1962); *Burroughs Corp. v. Cimakasky,* 346 F.Supp. 1398, 1400 (E.D.Pa.1972).

The defendant contends that all GBS franchisees are required by their franchise agreement with GBS to maintain listings in area telephone directories and their failure to do so can provide reason for cancellation of their franchise. Therefore, the defendant argues that the qualifying language in *Denawetz, supra,* is particularly applicable in the instant action:

> The customer and supplier lists did not constitute trade secrets. Equity will not protect mere names and addresses easily ascertainable by observation or by reference to directories. See *Spring Steels, Inc. v. Molloy,* 400 Pa. 354, 162 A.2d 370 (1960).

178 A.2d at 705. *See also Van Products Co., supra,* 213 A.2d at 777; *Burroughs, supra,* 346 F.Supp. at 1400.

The defendant attempted at the hearing to support his above assertion through the presentation of stipulated evidence that was gathered by two associates of the defendant who randomly searched nationwide telephone directories and were able to compile a list of 455 unduplicated names of GBS franchisees. This was compared to the 957 names on the list of franchisees supplied to defendant Rouse by GBS ("Rouse-GBS list"). Of the 455 unduplicated names of GBS franchisees found by Rouse's agents, 121, or 13%, were individual names of GBS franchisees and 267, or 28%, were listed by franchise name only. Therefore, of the 957

names on the Rouse-GBS list, Rouse was only able to compile in a random sampling 41 of those names after several days of full-time work in the public library. As a result of this data-gathering effort, the defendant contends that this proves that the Rouse-GBS list is not a trade secret because it can be easily duplicated through the use of telephone listings and is, therefore, not confidential but available from independent sources in the public domain.

■ The Court finds that the defendant's contentions are untenable for two reasons. A careful reading of the cases cited by the defendant, standing for the proposition that customer lists do not constitute trade secrets if obtainable from independent sources, suggests that this only applies if the information is "freely available" without "great difficulty," *Denawetz, supra,* 178 A.2d at 704; or "easily obtainable," *Burroughs, supra,* 346 F.Supp. at 1400. *See also Edwin Wiegand v. Harold E. Trent Co.,* 122 F.2d 920, 924 (3d Cir. 1941); *Spring Steells, Inc. v. Molloy,* 400 Pa. 354, 162 A.2d 370, 372–373 (1960).

Therefore, the inquiry becomes a two-part analysis: (1) whether the information contained on the customer lists is "obtainable" in significant part; and, (2) whether it is "freely" or "easily" obtainable without "great difficulty." As to the first question, the plaintiff correctly contends that the information contained in the Rouse-GBS list was not available or obtainable in nationwide telephone books. Of the 455 GBS franchisees located through examination of telephone books, 27% of those listings were for addresses no longer occupied by GBS franchisees. Furthermore, none of the listings in the telephone directories contained zip codes, in contrast to the Rouse-GBS list which does; or, the names of the spouses of GBS franchisees contained in part in the Rouse-GBS list. Finally, many of the franchisees that are not listed at all in nationwide telephone directories are found in the Rouse-GBS list.[2]

**2.** The plaintiff, in its statistical comparison of Ex. P–34 and P–35, refers the Court to the following non-inclusive examples of GBS fran-

chisee names contained in the Rouse-GBS list but not contained in telephone directories of the type used by Rouse's agents:

Therefore, as a result of these significant percentage variances between what is actually contained in the Rouse-GBS list and what was found regarding GBS franchisee information obtained in nationwide telephone directories, the Court finds that the information in the Rouse-GBS list is not obtainable or available without significant factual discrepancies.

Second, the information must be easily or readily obtainable without great difficulty. In the instant case, two agents of Rouse spent three to four days working full-time to compile only approximately one-half of the names on the Rouse-GBS list. To gather a nationwide listing of GBS franchisees from telephone directories would require more time and cost than could fairly be described as being "easily or readily obtainable without great difficulty." In any event, as indicated, the lists, even if they could be easily compiled, would not be significantly accurate.

The Court, therefore, finds that the Rouse-GBS list is a GBS-retained trade secret not easily and significantly obtainable from an independent source in the public domain.

The next question that must be addressed is whether the Rouse-GBS list was misappropriated from GBS or whether it was freely given to Rouse during his business association with GBS. Aside from the issue of whether GBS's list of franchisees is a trade secret, in order for the plaintiff to prevail, the list must also be found to be confidential in nature and there must be a breach of a confidential relationship in order for the party receiving the list to be found to have misappropriated the list. *See Heyman v. AR. Winarick, Inc.*, 325 F.2d 584, 586 (2d Cir. 1963); *Financial Programs, Inc. v. Falcon Financial Services, Inc.*, 371 F.Supp. 770, 771 (D.Or.1974).

Here, the list was given to defendant Rouse for the very limited purpose of being used to more easily facilitate his direct shipments of GBS products to GBS franchisees, but only during his business relationship with GBS. When the list was given to Rouse in the fall of 1974 by Arthur Tujague, a vice-president of GBS, Rouse was told by Tujague that the list was confidential, that it would be updated monthly and that the prior month's list should be destroyed when the new list arrived [N.T. 3–140 to 141]. Only Tujague had the authority to have the list sent to other persons and such authority was only utilized when persons were deemed to require the list on a "need-to-know" basis [N.T. 3–137 to 140 (Tujague); 4–97 (Turner)]. The GBS policy manual clearly stated that the list was to be a classified document and was not for public use. *See* Ex. P–42. In fact, copies of the list were not even given to GBS regional directors or field directors [N.T. 3–139 to 140 (Tujague); 2–24 to 25 (Py)]. When Rouse's business relationship with GBS ended, he nevertheless continued to use the lists for his own business solicitation purposes. The Court finds that the lists were intended by GBS to be confidential in nature and that the notion of confidentiality

---

*Naples & Marco Island, Florida*—3 names (100%) and 3 addresses (100%) which appear on [Rouse-GBS] list do not appear in the phone book.

*Austin, Texas*—3 names (100%) and 3 addresses (100%) which appear on [Rouse-GBS] list do not appear in the phone book.

*Charlotte, North Carolina*—3 names (100%) and 2 addresses (66⅔%) which appear on [Rouse-GBS] list do not appear in the phone book.

*Wilmington, North Carolina*—2 names (100%) and 2 addresses (100%) which appear on [Rouse-GBS] list do not appear in the phone book.

*Orange County, California*—1 name (7%) and 14 addresses (93%) which appear on [Rouse-GBS] list do not appear in the phone book.

*Greater Atlanta, Georgia*—14 names (100%) and 11 addresses (79%) which appear on [Rouse-GBS] list do not appear in the phone book.

GBS' Statement on Statistical Comparison of GBS Exhibits 34 and 35 at 2.

Defendant's argument that GBS franchises are required by contract to maintain their names in telephone directories is irrelevant. It is obvious that many do not and, therefore, for trade secret purposes, their names are not available from an independent source even though they might be if they abided by their contractual obligations to GBS.

was clearly conveyed to Rouse, who understood it and breached this confidential business relationship with GBS by using the lists for his own personal profit after he clearly was terminated by GBS. The fact that Rouse was at no time a contract employee of GBS is irrelevant in the context of the misappropriation of trade secrets. As the Second Circuit Court of Appeals held in *Heyman v. AR. Winawick, Inc., supra*:

> While there is no indication that plaintiff extracted from defendants a promise of trust with respect to information disclosed during their negotiations, an express agreement is not a prerequisite to the establishment of a confidential relationship. *Speedry Chemical Prods., Inc. v. Carter's Ink Co.*, [306 F.2d 328 (2 Cir.)] supra; *Underhill v. Schenck*, 238 N.Y. 7, 143 N.E. 773, 33 A.L.R. 303 (1924); *Biltmore Publishing Co. v. Grayson Publishing Corp.*, 272 App.Div. 504, 71 N.Y.S.2d 337 (1st Dep't 1947). A relationship of trust and confidence may naturally result from the circumstances surrounding the dealings between the parties.

325 F.2d at 586–587. *See also Institutional Management v. Translation Systems, Inc.*, 456 F.Supp. 661, 670 (D.Md.1978).

That a certain trust and sense of confidence existed between GBS and Rouse is evident from the fact that they chose to entrust to Rouse franchisee lists that they had given to no more than approximately 20 other persons in their organization and had not even been given to their own national regional directors with whom they were under exclusive contract. The Court concludes that Rouse breached this confi-

dential relationship by misappropriating confidential material given to him in reliance on that relationship.

■ The Court will preliminarily enjoin defendant Rouse from making any further use of the Rouse-GBS franchisee lists, but only to the extent that he is ordered to return originals or copies of those lists currently in his possession to counsel for GBS immediately for their disposal. The Court will not order defendant Rouse to expunge his computer banks of those names contained on the Rouse-GBS franchisee lists, nor preclude Rouse from having any business contact with those persons on the lists insofar as that contract does not violate any other provision of this Court's injunctive Order.

## II. *Trademark Infringement*

Plaintiff claims that, because defendant Rouse has used and continues to use logos, consisting of a circle of 25 stars surrounding the words "Check ✓ In" and "Check ✓ Out," in conjunction with his independent sale of an accounting pegboard system and because these logos are identical to the logos used by GBS to market similar systems, this constitutes a trademark infringement under 15 U.S.C. § 1114[3] and common law.

■ In order to assess whether a trademark infringement has resulted, it is first necessary to make a determination as to whether the party claiming the infringement has the legal ownership of the marks or, phrased another way, the legal standing to bring an infringement action. *See Armstrong Paint & Varnish Works v. Nu-Enam-*

---

**3.** 15 U.S.C. § 1114 provides, in relevant part:
(1) Any person who shall, without the consent of the registrant—
 (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
 (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertise-

ments intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.
shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) of this section, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

el Corp., 305 U.S. 315, 335, 59 S.Ct. 191, 201, 83 L.Ed. 195 (1938); *Perry v. American Hecolite Denture Corp.*, 78 F.2d 556, 558 (8th Cir. 1935); *Wrist-Rocket Mfg. Co., Inc. v. Saunders Archery Co.*, 379 F.Supp. 902, 906 (D.Neb.1974), *aff'd in part, rev'd in part on other grounds*, 516 F.2d 846 (8th Cir. 1975).

Rouse secured registration trademarks in the marks "Check In" and "Check Out," minus the circle of 25 stars and a check mark "√" between the words, from the United States Patent and Trademark Office in September and November of 1978, respectively. *See* Ex. P–16, P–17. For purposes of legal ownership of a mark, registration of that mark is only *prima facie* proof of legal ownership and may be rebutted by a party claiming and proving an adverse ownership. As the court in *Wrist-Rocket, supra,* held:

> Plaintiff's registration of the mark "Wrist Rocket" is prima facie evidence of its exclusive right to use the registered mark in commerce on the slingshots. 15 U.S.C. §§ 1057(b), 1115(a); *Phillip Morris, Inc. v. Imperial Tobacco Co.*, 251 F.Supp. 362, 378–379 (E.D.Va.1965), aff'd, 401 F.2d 179 (4th Cir. 1968), cert. denied, 393 U.S. 1094, 89 S.Ct. 875, 21 L.Ed.2d 784 (1969). This prima facie case does not preclude an opposing party from proving any legal or equitable defense or defect which might have been asserted in the absence of registration, 15 U.S.C. § 1115; it merely shifts the burden of doing so. *Persha v. Armour & Co.*, 239 F.2d 628, 630 (5th Cir. 1957). Furthermore, although plaintiff does hold an affidavit of incontestability issued under 15 U.S.C. § 1065, such an affidavit is not deemed an offensive weapon to aid in plaintiff's infringement action. *John Morrell & Co. v. Reliable Packing Co.*, 295 F.2d 314, 316 (7th Cir. 1961); *Tillamook County Creamery Ass'n v. Tillamook Cheese & Dairy Ass'n, supra,* (9 Cir.) 345 F.2d 158 at 163. The registration, except for the rebuttable presumption that it creates, clearly does not create rights to a trademark if they did not exist prior thereto.

379 F.Supp. at 906. *See also Massey Junior College, Inc. v. Fashion Institute of Technology*, 492 F.2d 1399, 1402 (Cust. & Pat. App.1974); *Holiday Inn v. Holiday Inns, Inc.*, 534 F.2d 312, 319 (Cust. & Pat.App. 1976). *See generally* 15 U.S.C. § 1057(b).

■ Legal ownership of a trademark under common law is determined by examining whether a party had both actual use and first use of the mark. As the court in *Modular Cinemas of America, Inc. v. Mini Cinemas Corp.*, 348 F.Supp. 578 (S.D.N.Y. 1972), stated:

> It is an axiomatic principle of trademark law that priority in adoption and actual use of a name of designation, as a trademark, is the essential criterion upon which ownership is based. *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916). It is this priority in time of trademark use, in commerce, which confers the quintessential right of exclusiveness and hence "ownership" upon the user. Registration confers certain procedural advantages upon a successful applicant; particularly, it is prima facie evidence of the validity of the registration, of the registrant's ownership of the mark, and its exclusive right to the use of it in commerce. 15 U.S.C. § 1057(b). Applying these principles to the case at bar, it is indisputable that plaintiff is the prior user and hence the exclusive owner even if the court accepts defendant's asserted earliest date of use—its date of incorporation—as applicable.

348 F.Supp. at 581. *See also Wrist-Rocket, supra,* 379 F.Supp. at 907.

Actual use has been defined by the courts as follows:

> [T]o hold that a sale or sales are the *sine qua non* of a use sufficient to amount to an appropriation would be to read an unwarranted limitation into the statute, for so construed registration would have to be denied to any manufacturer who adopted a mark to distinguish or identify his product, and perhaps applied it thereon for years, if he should in practice lease his goods rather than sell them, as many

manufacturers of machinery do. It seems to us that although evidence of sales is highly persuasive, the question of use adequate to establish appropriation remains one to be decided on the facts of each case, and that evidence showing, first, adoption, and, second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark, is competent to establish ownership, even without evidence of actual sales.

*New England Duplicating Co. v. Mendes,* 190 F.2d 415, 418 (1st Cir. 1951).

Furthermore, as the Trademark Trial and Appeal Board stated in *Sterling Drug, Inc. v. Knoll A. G. Chemische Fabriken,* 159 U.S.P.Q. 628 (T.T.A.B.1968):

> To acquire trademark rights there has to be an "open" use, that is to say, a use has to be made to the relevant class of purchasers or prospective purchasers since a trademark is intended to identify goods and distinguish those goods from those manufactured or sold by others.

159 U.S.P.Q. at 631.

 Therefore, the issue of actual use focuses on one primary and one secondary inquiry. The primary inquiry is: what did the public perceive to be the legal entity standing behind the mark? The secondary inquiry is: what did the parties intend the public to perceive as being the legal entity behind the mark? The intent of the parties to create such a perception in the public's mind is not conclusive evidence of what the public actually did perceive but is circumstantial proof, absent evidence to the contrary, that what the parties intended to be the public perception was, in fact, their actual perception. *See Sterling Drug, Inc., supra,* 159 U.S.P.Q. at 631.

The plaintiff, in its amended proposed findings of fact, details several factual items which the Court finds establishes that: (1) the public perceived GBS, and not Rouse, to be the legal entity whose good will and name stood behind the products bearing the "Check ✓ In" and "Check ✓ Out" logos or marks; and, (2) the parties intended that such a perception should be created.

The following findings of fact support these conclusions:

1. As recently as 1977, Rouse identified the systems and logos under which they were sold as GBS products in a pegboard manual copyrighted by him entitled "The Pegboard Systems Encyclopedia" [Ex. P–22A to F; N.T. 1–108 to 121 (Rouse)].

2. In October, 1977, Rouse delivered this pegboard manual to GBS, which had been requesting it since 1975 [N.T. 3–185 to 187; 4–66 to 68 (Pritchard); see also Ex. D–22]. It was produced and written in part by Rouse, after considerable input and exchange with GBS [N.T. 1–108 to 121; 3–77, 113 to 122 (Rouse); 3–185 to 187, 193; 4–68 (Pritchard)]. The Pegboard Encyclopedia (distributed to all GBS franchisees) [N.T. 3–78 (Rouse); 3–185 to 187, 191 to 192; 4–68 (Pritchard)] refers numerous times to the "Check ✓ Out" system as a "combination payroll disbursement system specifically designed for GBS clients" [see, e. g., Ex. P–22B] and the "Check ✓ In" system as an "accounts receivable system designed for GBS clients" [see, e. g., Ex. P–22C]. In other parts of the encyclopedia, the three systems are described as "three special systems [which] were designed to fit the special needs of GBS clients" [Ex. P–22G].

3. GBS began marketing the "Check ✓ Out" system to its franchisees in the fall of 1975 [N.T. 1–101 (Rouse); 3–159 to 160 (Pritchard); *see also* Ex. P–10B, C]. The "Check ✓ Out" system was introduced to GBS franchisees in October of 1975 by means of a brochure entitled "Introducing a New GBS System . . . check out" ("the check ✓ out brochure") [Ex. P–10B, C] which prominently displays the "Check ✓ Out" trademark designed by Raymond L. Py ("Py") on its cover [N.T. 2–16 to 19 (Py); *see also* 1–60 to 67 (Rouse)].

4. The cover and introductory letter over the signature of Bernard F. Browning were prepared by Py [N.T. 2–16 to 19, 40 (Py)]. Substantial portions of the brochure were written and/or reviewed by Rouse

[N.T. 1–60 to 66 (Rouse); see also Ex. P–10A, B].

5. The check ✓ out brochure [Ex. P–10B, C] describes the system as: "another new member of GBS Systems family"; "designed to fit into the GBS Blue Beauty"; "[b]ecause this system is designed especially for GBS, it is competition-proof and not available from any other pegboard manufacturer." Although he reviewed the check out brochure, Rouse at no time objected to these statements and, indeed, admitted that they were true, at least at the time they were made [N.T. 1–62 to 65; *see also* Ex. P–10A, B].

6. The check ✓ out brochure [Ex. P–10B, C] explains how the "Check ✓ Out" system operates and provides suggestions for promoting, marketing and advertising the system to GBS's clients [N.T. 2–16 to 19 (Py); 1–60 to 61 (Rouse)].

7. The check ✓ out brochure [Ex. P–10B, C] was sent to all GBS "Field Directors" and was used exclusively by GBS to promote sales of the "Check ✓ Out" system and forms among GBS franchisees and their clients [N.T. 1–60 to 62 (Rouse); 2–16 to 19 (Py); 4–158 to 163 (Wobensmith)].

8. Rouse admits that he did not use the check ✓ out brochure except in connection with his sales to GBS [N.T. 1–60 to 62 (Rouse); 4–158 to 164 (Wobensmith)].

9. The trademark consisting of an oval of stars surrounding the words "Check ✓ Out" not only appears on GBS promotional brochures, but it also appears along with the name "GENERAL BUSINESS SERVICES" on the check stubs of the business forms which were part of the "Check ✓ Out" system [Ex. P–52; D–8; N.T. 1–114; 3–41 to 42 (Rouse); 4–90 to 92 (Turner); 4–139 to 140 (Wobensmith)].

10. The trademark selected by GBS for marketing the companion "Check ✓ In" system was virtually identical to that used for the "Check ✓ Out" system, except for the substitution of the word "in" or "out." This trademark, consisting of the oval of stars surrounding the words "Check ✓ In," is prominently displayed along with the "Check ✓ Out" logo on the cover of a promotional brochure [Ex. P–19] used by GBS to introduce the "Check ✓ In" system and then market it with "Check ✓ Out" [N.T. 1–81 to 82 (Rouse)].

11. This brochure [Ex. P–19], which was sent to all GBS "Field Directors," was prepared jointly by GBS and Rouse to promote sales of both "Check ✓ Out" and "Check ✓ In" [N.T. 1–81 to 82 (Rouse)] and describes both "Check ✓ In" and "Check ✓ Out" as systems: "tailored to fit into the GBS system binder"; and, "two other members of the GBS family."

12. This brochure [Ex. P–19] was used exclusively by GBS to promote sales of the "Check ✓ In" and "Check ✓ Out" systems and forms among GBS franchisees and their clients [N.T. 1–81, 107 (Rouse); 4–158 to 164 (Wobensmith)].

13. Rouse admits that he did not use this brochure [Ex. P–19] except in connection with his sales to GBS [N.T. 1–81, 107 (Rouse); 4–158 to 164 (Wobensmith)] and, indeed, characterized it as "a marketing piece of theirs [GBS], not mine" [N.T. 1–81 (Rouse)].

14. GBS's "Check ✓ In" trademark not only appeared on the GBS promotional brochure, but it also appeared along with the words "GENERAL BUSINESS SERVICES" on the stubs of the business forms which were part of the "Check ✓ In" system [Ex. P–53; N.T. 1–106, 115–116 (Rouse); 4–92 to 93 (Turner); *see also* Ex. P–18, 22C].

The following findings of fact illustrate that, in addition, the parties intended either directly or by acquiescence that such a perception be created in the minds of the buying public:

15. The correspondence between the parties at the time shows that the cash disbursement system, which was first called Plan D and later marketed and sold by GBS as "Check ✓ Out," was designed exclusively for use with GBS's other products and for exclusive sale by GBS to GBS franchisees and their customers:

"We are confident that the new prices, coupled with the new GBS exclusive systems, will build confidence in the program in the field. . . ." (Rouse letter to GBS, June 30, 1975 [Ex. P–4; *see also* N.T. 1–55 to 56].)

"I am attaching mock-ups of the new GBS Payroll Disbursement System." (Rouse letter to Turner, August 25, 1975 [Ex. P–6].)

"Subject: New GBS Combination Payroll Disbursement System." (Turner letter to Rouse, September 2, 1975 [Ex. P–7].)

16. Rouse not only stated that at the time of the system's development "there was some thought of [marketing] exclusivity to GBS" [N.T. 3–73] (Rouse)], but also admitted that he at no time approached any "marketing house" other than GBS in connection with the system [N.T. 3–76; *see also* [N.T. 3–51 to 57, 99–101 (Rouse)]. Rouse admitted that the following statement was true at the time it was made in October of 1975:

"Because this system [Check ✓ Out] is designed especially for GBS, it is competition proof and not available from any other pegboard manufacturer."

[N.T. 1–63 to 65 (Rouse).] See also Rouse's letter to Lee Hepfner of June 30, 1975 [Ex. P–5] in which Rouse stated:

"I did indicate . . . that when the new GBS custom designed system [Check ✓ Out] is completed and approved by the folks in Washington and produced by us that your purchase of a sample kit will automatically entitle you to a board for the system, as well as sample forms which fit into the GBS blue system binder."

[N.T. 1–57 (Rouse).] Rouse admitted that he was not "aware of any" recordkeeping system other than the GBS Blue Beauty with which the "Check ✓ Out" system was "compatible" [N.T. 1–49] (Rouse)].

17. Like the "Check ✓ Out" system, "Check ✓ In" was designed exclusively for use with GBS's other products and for exclusive sale by GBS to GBS franchisees and their customers. This fact is set forth in a marketing brochure [Ex. P–19] jointly prepared by Rouse and GBS, and reviewed by Rouse in its entirety prior to its distribution to GBS franchisees in the spring of 1976, in conjunction with the introduction of the "Check ✓ In" system [N.T. 1–81 to 83 (Rouse)]. That brochure describes *both* "Check ✓ Out" and "Check ✓ In" as, *inter alia* : "tailored to fit the GBS system binder"; and "two other members of the GBS family." Rouse at no time objected to this characterization of "Check ✓ In" [N.T. 1–83 (Rouse)].

18. Rouse identified "Check ✓ Out" and "Check ✓ In" as "propriety systems" of GBS in talks he gave to GBS regional directors [Ex. P–15; *see also* N.T. 1–92 to 93 (Rouse)].

19. At the time of their introduction, GBS believed that not only the "Check ✓ In" and "Check ✓ Out" systems, but also the trademarks under which they were marketed, were unique and proprietary to GBS [N.T. 2–69 to 71 (Py); 3–146 (Tujague); 4–79 to 83, 86–87 (Turner); 3–163 to 164, 172 (Pritchard); *see also* Ex. P–10C, 15, 19, 22A to F]. GBS did not believe that it had developed and was using, marketing and promoting trademarks which belonged to Rouse [N.T. 2–69 to 71 (Py); 4–79 to 83, 86–87 (Turner)].

It is very important to understand from these findings of fact that, while there is no disagreement that the systems were developed by Rouse upon the request of GBS and for the exclusive use by GBS, the *systems* are not the subject of this trademark infringement action but, rather, only the *marks* themselves. These marks were created by GBS personnel and not Rouse [N.T. 2–13 to 16, 58–59, 61–63, 65–67 (Py); 4–80 to 82 (Turner)]. Furthermore, although the creation of a mark is not enough for purposes of first use, *see Modular, supra*, 348 F.Supp. at 582, GBS purchased the systems from Rouse and, through the use of its nationwide franchise marketing and advertising systems, sold the systems with the affixed logos to GBS franchisees who ultimately sold them to the public. As indicated, in summary, the printed forms comprising the pegboard systems carried the

"Check ✓ In" and "Check ✓ Out" logos surrounded by a circle of 25 stars [*see* Ex. P–52, 53]. Furthermore, the forms also contained the name of the GBS corporation. The logos were also used in the marketing brochures distributed by GBS and in training manuals used to instruct GBS franchisees in the use of the systems. Training seminars were conducted by GBS at which the systems identified by the logos were discussed. Rouse was a participant at many of these seminars where he explained the mechanics of the systems.

In his defense, Rouse claims that he also had actual use of the logos by sales of pegboard systems containing the logos through his wholly owned corporate entities directly to retail customers [*see* Ex. C–2 to 15]. Even if Rouse did have actual use of the marks in commerce, the issue is not merely one of actual use but of a prior first use. As the court in *Wrist-Rocket, supra,* held:

> Undoubtedly, the general rule is that, as between conflicting claimants to the right to use the same mark, *priority of appropriation determines the question.* * * * (T)he reason is that purchasers have come to understand the mark as indicating the origin of the wares, so that its use by a second producer amounts to an attempt to sell his goods as those of his competitor. (Citations omitted.)

379 F.Supp. at 907 (emphasis added), *quoting United Drug Co. v. Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918). *See also Sweetarts v. Sunline, Inc.,* 380 F.2d 923, 926 (8th Cir. 1967); *Rolley, Inc. v. Younghusband,* 204 F.2d 209, 212 (9th Cir. 1953).

The first sales of the pegboard systems with the marks "Check ✓ Out" and "Check ✓ In" were made by GBS, and not Rouse, in conjunction with the GBS corporate name which appears not only on the advertising brochures and training manuals for the systems, but on the forms themselves. None of these first sales make any mention on the forms, brochures or manuals of Rouse or any of his corporate entities. Sales of the "Check ✓ Out" system were begun by GBS in October of 1975 and of the "Check ✓ In" system in the spring of 1976. During these first sales by GBS, Rouse was the exclusive supplier of the systems to GBS, who purchased them from Rouse and distributed them to its franchisees. Although many of these first sales were shipped by Rouse directly to GBS franchisees rather than through GBS, neither Rouse nor any of his corporate entities were identified with the marketing or advertising of the systems, or on the forms themselves. By the time that Rouse did make direct sales to retail customers through his wholly owned corporations and identified his corporate identity on the forms of the systems, the first sales had already been made by GBS. An examination of Ex. C–2 to 15 reveals that the first sales of the "Check ✓ Out" systems and logo by Rouse's Titan Business Systems was not until July 30, 1976 [*see* Ex. C–2], which is almost nine months after GBS made its first sales of those systems and marks. Similarly, Rouse's first sales of the "Check ✓ In" systems and logo through Titan Business Systems was not until September 29, 1976, which is several months after GBS's first sales of those systems and marks [*see* Ex. C–5].

The Court finds that the only perceptions GBS franchisees or the retail public received in these first sales of the systems and marks as to Rouse's involvement in the ownership of the logos was that Rouse developed the systems and was the exclusive supplier and occasional lecturer for GBS. In fact, complaints concerning the systems were directed to GBS and not to Rouse. Ironically, it was complaints concerning Rouse's method of supplying the systems to franchisees which ultimately prompted his termination with GBS. The first sales of the systems, with the marks, clearly identified GBS, and not Rouse, as the legal entity behind the marks. The Court finds, therefore, that GBS had the first sales in commerce involving the marks and not Rouse.

Rouse raises several other arguments that are equally without merit. First, he claims that the only use made of the logos

by GBS was merely to advertise the logos. As discussed, GBS did much more than advertise the logos. They had the logos affixed to the products they purchased and sold, which also contained their own corporate logo. *See Blue Bell, Inc. v. Farah Manufacturing Co., Inc.*, 508 F.2d 1260, 1265 (5th Cir. 1975); *Electronic Com'ns, Inc. v. Electronic Components For Ind. Co.*, 443 F.2d 487, 492 (8th Cir. 1971) ("The mere advertisement of words or symbols without application to the goods themselves is insufficient to constitute a trademark."); *Rolley, supra*, 204 F.2d at 212 ("He who first affixes a trade-mark upon his goods is its owner . . . .").

Second, Rouse's contention that shipments of the systems containing the marks from his printer, Eastern Systems, Inc., to Rouse constituted first use of the marks is also meritless. These types of shipments have been held by courts to not be actual use in commerce to which the public could identify the legal entity behind the marks. *See Blue Bell, supra*, 508 F.2d at 1265. In the same vein, shipments from Rouse to GBS are also not sufficiently in commerce to cause the public to identify the marks with Rouse. The only shipments by Rouse that were sufficiently in commerce to constitute actual use were the direct shipments Rouse made to GBS franchisees and to a few of Rouse's own customers. As noted, these direct shipments by Rouse identified the products with GBS and not Rouse. Further, by the time Rouse made direct shipments under his own corporate names, GBS had already made the legal first use of the marks.

■■■■ Rouse maintains, thirdly, that the unique business relationship that existed between himself and GBS, where he served as the creator and supplier of the pegboard "Check ✓ In" and "Check ✓ Out" systems and GBS served as the exclusive distributor of those systems, vested legal ownership in the marks with Rouse and not GBS. Rouse refers this Court to several decisions involving manufacturer-distributor relationships where the courts held that the manufacturer and not the distributor

retained the legal rights to the marks affixed to certain goods. *See Spencer v. VDO Inst., Ltd.*, 232 F.Supp. 735 (E.D.Mich. 1964). *See also Casual Corner Associates, Inc. v. Stores of Nevada, Inc.*, 493 F.2d 709 (9th Cir. 1974); *Shaver v. Heller & Merz Co.*, 108 F. 821 (9th Cir. 1901); *Paul v. Woods*, 40 F.2d 668 (E.D.N.Y.1930).

Rouse mischaracterizes his relationship with GBS. He was the developer and supplier of the forms but not their manufacturer. Eastern Systems, Inc., the printer of the forms, was the manufacturer of the forms with the marks. Also, while Rouse created the systems, he did so at the specific request of GBS; GBS personnel, and not Rouse, created the marks themselves that became identified with those systems. Furthermore, GBS purchased the systems from Rouse bearing both the disputed marks and the GBS corporate name. Rouse's corporate logo did not appear anywhere on these initial shipments. The court in *Rolley, supra*, held as follows:

> He who first affixes a trade-mark *upon his goods* is its owner, not the person who first conceives the idea. See *Columbia Mill Co. v. Alcorn*, 1893, 150 U.S. 460, 463–464, 14 S.Ct. 151, 152, 37 L.Ed. 1144.
> . . .

204 F.2d at 212 (emphasis in original). This applies to the present inquiry.

Courts have long held that a party need not itself manufacture the goods in order to acquire a valid trademark in the marks affixed to the goods. *See Menendez v. Holt*, 128 U.S. 514, 520, 9 S.Ct. 143, 32 L.Ed. 526 (1888) ("The fact that Holt & Co. were not the actual manufacturers of the flour upon which they had for years placed the brand in question, does not deprive them of the right to be protected in the use of that brand as a trademark.").

The inquiry to be made to determine which party acquires legal ownership of the marks affixed to manufactured goods was stated as follows:

> The use of a trademark, however, does not necessarily and as a matter of law impart that the articles on which it is used are manufactured by its user. It is

enough that they are manufactured for him, that he controls their production, or that they pass through his hands in the course of trade and that he gives to them the benefit of his reputation or of his name and business style. *Feather Combs, Inc. v. Solo Products Corp.*, 2d Cir., 306 F.2d 251, cert. den. 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962).

*Victor Tool & Machinery Corp. v. Sun Control Awnings, Inc.*, 299 F.Supp. 868, 874 (E.D.Mich.1968), aff'd, 411 F.2d 792 (6th Cir. 1969), *quoted in Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 478 F.Supp. 243, 279 (E.D.Pa.1979). *See also Southeastern Brewing Co. v. Blackwell*, 80 F.2d 607, 610 (4th Cir. 1935).

Here, the systems with the marks were manufactured for GBS; they passed through its hands in the course of trade; and, the good will and benefits of GBS's nationwide reputation became associated with the marks, as evidenced by the GBS brochures, training manuals and other marketing techniques employed by GBS in distributing the systems to its franchisees and eventually to the public.

Particularly analogous to the present case is the case of *Distillers Brands, Inc. v. American Distilling Co.*, 26 F.Supp. 988 (S.D.N.Y.1938). In that case, the plaintiff, a bottler of whiskey, sold whiskey to the defendant as a distributor. The bottles bore a mark which came to be identified with the defendant. When the plaintiff-bottler brought an infringement action against the defendant-distributor, the court held:

> The plaintiff's name did not appear on the labels or elsewhere on the bottles, and it sold no whiskey so named to any other customer. The King Company proceeded to build up a trade in the King's Pride Whiskey.
>
> \* \* \* \* \* \*
>
> Where a trademark indicates a distributor of merchandise rather than the maker, it is the distributor who acquires the trademark rights. For the public associates the goods so marked with the distrib-

utor and knows not the identity of the maker. . . .

26 F.Supp. at 988–989.

The exact factual relationship existed here between Rouse and GBS, which created in GBS the first use of the marks in issue and, hence, the legal ownership rights to the marks, along with the legal standing to bring and enforce this trademark infringement action against Rouse.

▓ Rouse's fall-back defense is that, even if GBS had the legal ownership rights to the marks, they abandoned or waived those rights. To establish abandonment or waiver of a previously acquired legal right to trademarks, it must be shown that the legal owner intended to abandon the marks. *See Tillamook County Creamery Ass'n v. Tillamook Cheese and Dairy Ass'n*, 345 F.2d 158, 162 (9th Cir. 1965).

Rouse bases his assertion of abandonment in large part on a May, 1976, meeting between Rouse and Robert Turner ("Turner"), a vice-president of GBS. At that meeting, the two parties discussed the possibility of registering the marks "Check ✓ In" and "Check ✓ Out" to protect these marks from competitors. Turner testified that he believed these protection concerns were not merely for the benefit of Rouse [N.T. 4–83 to 85, 107–111]. Later, in a letter from Rouse to Turner, Rouse stated that he would keep Turner informed about the possibility of registering the marks [see Ex. D–1]. Despite having knowledge and thoughts about registration thereafter, Rouse never did keep Turner or anyone else at GBS informed about registering the marks but instead registered the marks in his own name. GBS found out about Rouse's registration only upon investigation about the possibility of registration. Only then was GBS informed by Rouse that he had already registered the marks for himself.

From these facts, the Court concludes that GBS never intended to abandon or waive their previously obtained rights to the marks "Check ✓ In" or "Check ✓ Out." GBS's intent to register the marks is evidenced by their own investigation of the

legal mechanics of registration. GBS never told Rouse that he could or should register the marks in his own name, nor can that be inferred from the facts on the record before this Court. GBS's failure to secure a registration in the marks prior to Rouse's does not indicate an intent to abandon, but merely the fact that Rouse won the race to the Patent Office. The marks were first used by GBS and, therefore, its legal rights to the marks were protected under common law and were not subrogated by Rouse's subsequent registration of the marks, since registration is only prima facie proof of ownership which can be subject to rebuttal, as the plaintiff has successfully done here.

■ One of Rouse's arguments is that GBS had constructive notice of the registration of the marks and GBS's failure to contest Rouse's registration of the marks raises the affirmative defense of laches. Although 15 U.S.C. § 1072[4] states that registration of a mark is constructive notice, this time designation is aimed at taking away from future users of the mark the defense of innocent appropriation. It is not provided for the purpose of supporting the defense of laches. See Valmor Products Co. v. Standard Products Corp., 464 F.2d 200, 204 (1st Cir. 1972); In re Beatrice Foods Co., 429 F.2d 466, 472 (U.S.C.P.A.1970). In order for laches to be proven, there must be a showing that a party willfully or negligently failed to assert its rights to the marks. See Valmor, supra. GBS was neither negligent nor willful in failing to assert its rights to the marks prior to this litigation. GBS was investigating the possibility of registering the marks and at the same time waiting for Rouse to keep them informed of his investigatory findings. This is neither willfulness nor negligence by GBS. Rather, it indicates resourcefulness and reasonable good faith reliance on Rouse's assurances. Furthermore, at the hearing, it was shown that, upon learning of Rouse's registration and infringement of the marks, GBS immediately notified its franchisees of the state of affairs and this lawsuit for injunctive relief was filed soon afterward [see Ex. P–18].

Having found that GBS has the legal ownership of the marks "Check ✓ In" and "Check ✓ Out" through both factual and first use, the final question is whether or not Rouse infringed upon GBS's right to those marks under 15 U.S.C. § 1114.

The judicial test established to determine whether there has been a trademark infringement is whether the defendant's use of the mark would be likely to cause confusion among the consuming public as to the source or origin of the products. The test is not limited to whether there has been actual confusion among the consuming public, but only that likelihood of confusion must be shown to exist. Alfred Dunhill v. Kasser Distillers Products Corp., 350 F.Supp. 1341, 1360 (E.D.Pa.1972), aff'd, 480 F.2d 917 (3d Cir. 1973); Telechron, Inc. v. Telicon Corp., 198 F.2d 903, 909 (3d Cir. 1952); Chips 'N Twigs, Inc. v. Chip-Chip, Ltd., 414 F.Supp. 1003, 1013 (E.D.Pa.1976); Amway Corp. v. William Simon, Civil Action No. 78–1424, slip op. at 1–2 (E.D.Pa., October 18, 1979).

■ As this Court held in the case of Motor Master Products Corp. v. Motor Masters, 446 F.Supp. 165, 168 (E.D.Pa.1978), the factors for the Court to consider when assessing the likelihood of confusion, for infringement purposes, are found in Restatement of Torts, 2d at § 729:

(a) the degree of resemblance between the designation and the other's trade name, trademark or certification mark in

(i) appearance;

(ii) pronunciation of the words involved;

(iii) translation of the words involved;

(iv) verbal translations of the pictures or designs involved;

(v) suggestiveness, connotation or meaning of the actor's designation and the trade name, trademark or certification mark involved;

---

4. 15 U.S.C. § 1072 provides:

Registration of a mark on the principal register provided by this chapter or under the Act of March 3, 1881, or the Act of February 20, 1905, shall be constructive notice of the registrant's claim of ownership thereof.

(b) the intent of the actor in adopting and using the designation.

(c) the similarity of circumstances and conditions surrounding the purchase of the goods or services involved;

(d) the degree of care likely to be exercised by purchasers of the goods or services involved.

All of the above factors must be considered when determining the likelihood of confusion, mistake or deception with no single factor being determinative. *Id.* at 168.

The marks used by Rouse and GBS are identical.[5] They are used to market similar products, *Tefal, S.A. v. Products International Co.*, 529 F.2d 495, 497 (3d Cir. 1976), and are directed at the same buying market, including persons who are franchisees for GBS. *Chips 'N Twigs, supra*, 414 F.Supp. at 1016; *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971).

Confusion has been shown to actually exist among many GBS franchisees and their customers who are the targets of both Rouse's and GBS's marketing efforts to sell similar products to which identical marks have been affixed. This actual state of confusion has been admitted by defendant Rouse [N.T. 2–86 to 89], and is in large part due not only to the identical nature of the marks, products and market reached, but also caused by concurrent use of similar marketing techniques and terminology by both parties. For example, Rouse has affixed to the pegboard forms which he now markets the statement "When it's time to reorder, please contact your local field director" [Ex. P–28]. That this statement is intended to mean a GBS field director and that that meaning is conveyed to the consuming public is manifest. *See Tefal, supra*, 529 F.2d at 497. A clearer case of actual or likely confusion constituting trademark infringement would be difficult to find.

▪ Therefore, the Court finds that defendant Rouse has infringed upon the legal ownership right of GBS to the marks "Check ✔ In" and "Check ✔ Out," with or without the circle of 25 stars or the check mark, because either use of the marks could cause actual or likely confusion among the public. The Court will preliminarily enjoin defendant Rouse or any of his corporations from any further use of the two marks in connection with: (1) the sale of pegboard-type systems to the market comprising GBS franchisees, their customers or any others; (2) the employment of any marketing, advertising techniques or terminology of the type either used until the present that have been found to be confusing or deceptive, or that may be used in the future which will actually cause or have the likelihood of causing confusion among the buying public as to the source of those marks. Finally, while Rouse's use of the marks has violated the interests meant to be protected by the trademark laws, *see Motor Master, supra*, 446 F.Supp. at 168, the Court is careful to note that it is not enjoining Rouse from marketing his pegboard systems, under another mark which will not confuse or deceive, to the present retail customers of GBS or to GBS franchisees.[6] That use would be merely entrepreneurship in the free market, which is not prohibited by the

---

**5.** The marks used by GBS, as they appear on the forms comprising the GBS pegboard systems, are as follows:

Ex. P–52.

GENERAL BUSINESS SERVICES

Ex. P–53.

The mark used by Rouse since his termination with GBS, appearing on the forms for his pegboard systems, is as follows:

Ex. P–28. Rouse's use of the mark "Check ✔ In" was not admitted into evidence as an exhibit but was admitted by Rouse to be identical to the "Check ✔ Out" mark [Ex. P–28] except for the use of the word "in" for "out" [N.T. 2–115 to 116].

**6.** *See* discussion *infra* concerning GBS's claim for tortious interference of contract by Rouse involving GBS franchisees.

trademark laws. This injunction is only intended to prevent Rouse from employing methods and marks designed or having the effect of causing actual or likely confusion or deception among the consuming public as to the source of the marks affixed to his products.[7] Finally, while defendant Rouse is permitted, for preliminary injunction purposes, to make sales of his pegboard systems to GBS franchisees without the use of the "Check ✓ Out" or "Check ✓ In" marks or previously mentioned prohibited marketing devices, he will be preliminarily enjoined from making any oral or written statements or representations that would cause GBS franchisees or the retail public to believe, contrary to fact, that defendant Rouse's pegboard systems products are in any way sponsored, endorsed, approved or otherwise connected or affiliated with GBS as an entity or its pegboard systems identified by the "Check ✓ In" and "Check ✓ Out" marks. To allow such representations or statements would thwart the interests that the trademark laws are designed to protect.

### III. Unfair Competition

■ The Court has found that defendant Rouse: (1) infringed upon GBS's trademark claim to the marks "Check ✓ In" and "Check ✓ Out"; and, (2) misappropriated trade secrets from GBS in the form of lists of GBS franchisees. Both findings support the further claim of the plaintiff for unfair competition under 15 U.S.C. § 1125(a). As the court in Franklin Mint, Inc. v. Franklin Mint, Ltd., 331 F.Supp. 827 at 831 (D.C.) stated, "trademark infringement is but one aspect of the broader field of unfair competition." See also Heyman v. A. R. Winarick, Inc., supra, 325 F.2d 584 (2d Cir. 1963)

(misappropriation of trade secrets supports a claim of unfair competition).

### IV. Tortious Interference with Contract

GBS makes a final claim that Rouse, through his solicitation of GBS regional directors to sell Rouse's own products for which they were to have been offered "overrides" (i. e., commissions to directors on the sales they promote for Rouse's own products within their geographic area) [see Ex. P–25], has tortiously interfered with the contractual arrangement between GBS and its regional directors. That contract provides that regional directors are under exclusive contract with GBS to promote the sales of GBS products and services and not those of GBS's competitors [see Ex. P–51]. GBS also claims that Rouse tortiously interfered with another provision of that exclusive contract by attempting to obtain information from GBS regional directors about new GBS franchisees [see Ex. P–25]. This action, GBS claims, interferes with the contractual provision prohibiting GBS regional directors from attempting to divert business to other competitors [see Ex. P–51].

■ The inquiry that Pennsylvania courts have made to determine whether there has been a tort of inducing a breach of contract is whether the defendant "intentionally interfere[d] with an existing contractual relation . . . ." Morgan's Home Equip. Co. v. Martucci, supra, 136 A.2d at 847. The defendant need not have been specifically knowledgeable of a contract right (i. e., exclusivity of dealings) as long as he was on notice based on the circumstances of the existence of a contractual arrangement. See Mixing Equip. Co.

7. Having found that Rouse infringed upon GBS's legal right to the marks under § 1114 and common law, Rouse's trademark registrations in the marks "Check ✓ In" and "Check ✓ Out" are invalid because GBS and not Rouse had first use of the marks in commerce. Rouse never had use of the marks without the circle of 25 stars or check mark between the words which constituted the marks registered by Rouse; therefore, the Court need not consider the additional issues of whether representations made by Rouse to the Patent and Trade-

mark Office were knowingly false and misleading or whether his registration was fraudulently obtained. The Court will not consider whether use of the 25 stars alone would constitute trademark infringement because, at the time of the preliminary injunction hearing, it was shown that Rouse has not made any use of a circle of 25 stars alone and, therefore, the issue for injunctive purposes is moot. The same holding would apply to the mark "Check ✓ Up," because it was not shown that Rouse has ever used that mark in commerce.

*v. Philadelphia Gear Co.,* 312 F.Supp. 1269, 1275 (E.D.Pa.1970).

In the instant case, even if Rouse was aware that GBS regional directors were under contract to GBS, the Court cannot find on the present record that Rouse intentionally attempted to purposefully interfere with the exclusive contractual arrangement between GBS and its regional directors or even that he was aware of the exclusivity of the contract prior to the hearing.

It is plain that the evidence adduced at the hearing has now put Rouse on notice and, if that did not, this Opinion does put Rouse on notice that such an exclusive contract does exist and, for future purposes of tortious interference with that contractual right, he can be enjoined by this Court. *See Morgan's Home Equip. Corp., supra,* 312 F.Supp. at 1276.

Rouse has raised the defense and asserted a counterclaim, contending that GBS's tortious-interference-of-contract claim is in actuality an attempt by GBS to prevent Rouse from competing in the free market with GBS franchisees as a supplier of pegboard systems. Rouse alleges that GBS, by trying to prevent · Rouse from selling his products to GBS franchisees and offering them overrides to sell his products or approaching them about selling his products which are directly competitive with GBS's pegboard systems, constitutes a tying arrangement under the Sherman Anti-Trust Act and the Clayton Act. This tying arrangement, the defendant argues, would force GBS franchisees to buy pegboard systems supplies solely from GBS as the exclusive supplier and exclude them from buying similar supplies from other suppliers, in particular Rouse. Rouse cites the following cases in support of his assertion: *Carpa, Inc. v. Ward Foods, Inc.,* 536 F.2d 39 (5th Cir. 1976); *Warriner Hermetics, Inc. v. Copeland Refrigeration Corp.,* 463 F.2d 1002 (5th Cir. 1972); *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43 (9th Cir. 1971); *cf., Kentucky Fried Chicken v. Diversified Packaging Corp.,* 549 F.2d 368 (5th Cir. 1977).

■ The problem the Court faces at this juncture of the litigation is that, for prelim-inary injunctive purposes, plaintiff must meet the burden of proof of showing that it has a reasonable likelihood of succeeding on the merits of each of its claims. The defensive antitrust allegations raised by Rouse were not addressed by plaintiff in pleadings, oral argument or with direct evidence at the time of the hearings on the preliminary injunction. Tying arrangements have been held to be *per se* illegal even when intertwined with the use of a trademark. *See Warriner Hermetics, Inc. v. Copeland Refrig. Corp., supra; Siegel v. Chicken Delight, Inc., supra.* However, there are various court-created exceptions to that rule in the context of a franchise relationship. *See, e. g., Kentucky Fried Chicken v. Diversified Packaging Co., supra; Susser v. Carvel Corp.,* 332 F.2d 505 (2d Cir. 1964); *Pick Mfg. Co. v. General Motors Corp.,* 80 F.2d 641 (7th Cir. 1935), *aff'd per curiam,* 299 U.S. 3, 57 S.Ct. 1, 81 L.Ed. 4 (1936); *Seligson v. Plum Tree, Inc.,* 361 F.Supp. 748 (E.D.Pa.1973); *U. S. v. Jerrold Electronics Corp.,* 187 F.Supp. 545 (D.C.Pa.1960), *aff'd per curiam,* 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961).

■ On the present record, GBS has not shown a reasonable likelihood of ultimately succeeding on its claim of tortious interference of contract because it has not presented, either in its pleadings or at the hearing, any of the above judicial justifications to counter Rouse's antitrust allegations. The Court finds that defendant Rouse's antitrust [tying arrangement] allegation, found by many courts to be *per se* illegal, is neither frivolous nor meritless on the present record. Courts have held that, where there are serious material factual and legal issues in dispute, preliminary injunctive relief should be denied. *See Texaco Independent Union of Coraopolis Terminal v. Texaco, Inc.,* 452 F.Supp. 1097 (W.D.Pa.1978); *Eutectic Welding Alloys Corp. v. Zeisel,* 11 F.R.D. 78 (D.N.J.1950). *See also Judice's Sunshine Pontiac, Inc. v. General Motors Corp.,* 418 F.Supp. 1212 n.10 at 1216 (D.N.J. 1976); *Industrial Electronics Corp. v. Cline,* 330 F.2d 480, 482 (3d Cir. 1964).

Therefore, for preliminary injunction purposes, the plaintiff's claim of tortious interference of contract against defendant Rouse involving GBS franchisees will be denied, because the plaintiff has failed to show a reasonable likelihood of succeeding on the merits of that claim on the present record in the face of the plausible antitrust allegation of the defendants.

V. *Irreparable Injury and Balancing of Hardships*

█ The Court finds that, because Rouse has been found to have wrongfully appropriated GBS's franchisee lists, infringed upon GBS's legal right to the marks "Check ✓ In" and "Check ✓ Out" and engaged in unfair competition with GBS, GBS will be irreparably harmed unless injunctive relief is granted. *See P. Daussa Corp. v. Sutton Cosmetics (P.R.), Inc.*, 462 F.2d 134, 136 (2d Cir. 1972); *Omega Importing Corp., supra*, 451 F.2d at 1195; *Chips 'N Twigs, supra*, 414 F.Supp. at 1019; *Franklin Mint, Inc. v. Franklin Mint, Ltd., supra*, 331 F.Supp. at 831; *Villager, Inc. v. Dial Shoe Co.*, 256 F.Supp. 694, 698 (E.D.Pa.1966). Finally, in the balance of hardships in the instant action, GBS will suffer more if injunctive relief is not granted due to its extensive and expensive establishment of advertising and marketing systems which stand in jeopardy unless injunctive relief is granted. Rouse's interest cannot outweigh that of GBS due to his relatively smaller number of customers among GBS franchisees, and his comparatively limited inventory, advertising and marketing development. *See Omega Importing, supra*, 451 F.2d at 1195; *Villager, Inc., supra*, 256 F.Supp. at 698–699. Finally, the Court finds that the public interest in the present case regarding injunctive relief is minimal and in any event would not be harmed by a grant of injunctive relief.

An appropriate Order will be entered.